SLIP OP. 04-55

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____

|  |  |  |
|---|---|---|
| HONTEX ENTERPRISES, INC., d/b/a/ LOUISIANA PACKING CO., | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| V. | : | COURT NO. 00-00223 |
| | : | PUBLIC VERSION |
| UNITED STATES, | : | |
| | : | |
| DEFENDANT, | : | |
| | : | |
| AND | : | |
| | : | |
| CRAWFISH PROCESSORS ALLIANCE, THE LOUISIANA DEPARTMENT OF AGRICULTURE AND FORESTRY, AND BOB ODOM, COMMISSIONER, | : | |
| | : | |
| DEFENDANT-INTERVENORS. | : | |

_____

[United States Department of Commerce's final antidumping duty determination remanded to Commerce a second time.]

Dated: May 21, 2004

*Coudert Brothers LLP* (*John M. Gurley* and *Matthew J. McConkey*), for Plaintiff Hontex Enterprises, Inc.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Jeanne E. Davidson*, Deputy Director, International Trade Section, Commercial Litigation Branch, Civil Division, United State Department of Justice (*David S. Silverbrand*); *Marisa Beth Goldstein*, of counsel, Office of the Chief Counsel for Import

Administration, United States Department of Commerce, for Defendant United States.

    *Adduci, Mastriani & Schaumberg, L.L.P.* (*James Taylor, Jr.* and *Will E. Leonard*), *John C. Steinberger*, of counsel, for Defendant-Intervenors Crawfish Processors Alliance, the Louisiana Department of Agriculture and Forestry, and Bob Odom, Commissioner.

<br>

OPINION AND ORDER

EATON, *Judge*:  This matter is before the court following remand to the United States Department of Commerce ("Commerce").  In *Hontex Enterprises, Inc. v. United States*, 27 CIT __, 248 F. Supp. 2d 1323 (2003) ("*Hontex I*"), this court remanded Commerce's determination contained in Freshwater Crawfish Tail Meat From the P.R.C., 65 Fed. Reg. 20,948 (ITA Apr. 19, 2000) (final results admin. rev.; rescission of new shipper rev.) ("Final Results").  Plaintiff Hontex Enterprises, Inc. ("Hontex")[1] had challenged certain aspects of that determination with respect to Ningbo Nanlian Frozen Foods Company ("NNL"),[2] covering its imports of freshwater crawfish tail meat from the People's Republic of China ("PRC").  The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the reasons set forth below, this matter is remanded to Commerce with instructions to conduct further proceedings in conformity with this opinion.

---

    [1]    As a domestic importer of the subject merchandise, Hontex is an "interested party" within the meaning of 19 U.S.C. § 1677(9)(A) (2000), and is entitled to challenge Commerce's determination pursuant to 19 U.S.C. § 1516a(a)(2) (2000).  In addition to being a domestic importer of the subject merchandise, Hontex is also part-owner of Ningbo Nanlian Frozen Foods Company.

    [2]    Throughout its papers Hontex refers to NNL as "Plaintiff" in this action.  As it was NNL and not Hontex that was investigated by Commerce, the court understands that any argument as to the propriety of Commerce's actions is limited to NNL.

BACKGROUND

The relevant facts and procedural history in this case are set forth in *Hontex I*. A brief

summary of those facts is included here. Commerce conducted its original investigation of the

subject merchandise for the period of review of March 1, 1996, through August 31, 1996. *See*

Freshwater Crawfish Tail Meat From the PRC, 62 Fed. Reg. 41,347 (ITA Aug. 1, 1997) (final

determination). As a result of this investigation, Commerce issued an antidumping duty order

pursuant to which several exporters received company-specific antidumping duty margins,

several received "cooperative" margins, and the remainder received the "PRC-wide" margin,

which was set at 201.63%. *See id*. at 41,358. One of the exporters investigated was Huaiyin

Foreign Trade Corporation (5) ("HFTC5"). *See* Final Results, 65 Fed. Reg. at 20,949.

On March 27, 1998, NNL requested a new shipper review. *See* Freshwater Crawfish Tail

Meat From the PRC, 63 Fed. Reg. 25,449 (ITA May 8, 1998) (initiation of new shipper rev.).

This review covered the period of September 1, 1997 (the anniversary date of the original

investigation), through March 31, 1998.[3] *Id*. at 25,449. Following this review Commerce

determined that for this period NNL's antidumping duty margin was 0.0%. *See* Freshwater

Crawfish Tail Meat From the PRC, 64 Fed. Reg. 27,961, 27,966 (ITA May 24, 1999) (final

results of new shipper rev.).

---

[3]       The period of review ("POR") for HFTC5 and NNL was generally identified as
March 26, 1997, through August 31, 1998. *See* Initiation of Antidumping and Countervailing
Duty Admin. Rev., 63 Fed. Reg. 58,009, 58,010 (ITA Oct. 29, 1998) (initiation of review).
Because NNL had participated in a new shipper review, however, NNL's POR was identified as
April 1, 1998, through August 31, 1998. *See* Freshwater Crawfish Tail Meat From the PRC, 64
Fed. Reg. 55,236, 55,237 (ITA Oct. 12, 1999) (prelim. results of rev.).

Subsequently, pursuant to a request for administrative review, Commerce initiated a

review of HFTC5 and NNL.  *See* Initiation of Antidumping and Countervailing Duty Admin.

Rev., 63 Fed. Reg. at 59,010 (ITA Oct. 29, 1998).  In response to the antidumping questionnaires

sent by Commerce, both NNL and HFTC5 claimed that they did not share managers or owners,

or share common control with other crawfish tail meat exporters.  *See* NNL Sec. A Resp., Pub.

R. Doc. 19, at 3 ("NNL Sec. A Resp."); HFTC5 Section A Resp., Pub. R. Doc. 24, at 4 ("HFTC5

Sec. A. Resp.").

Prior to verification, however, questions arose as to the relationship between NNL and

HFTC5 with respect to possible affiliation.  Despite the companies' representations that they did

not share managers, a "Mr. Wei"[4] was listed on NNL's business license as its "Vice G.

Manager," and this name also appeared on a HFTC5 sales invoice dated during NNL's POR.  *See*

NNL Sec. A Resp., Ex. 4; HFTC5 Sec. A Resp., Ex. 7.  In order to clarify this relationship,

Commerce sent NNL[5] a letter asking it to "explain the contradiction between Ningbo Nanlian's

claim [in its original questionnaire response] not to share managers with other Chinese crawfish

exporters and the evidence on the record of this review that shows Mr. Wei Wei was a manager

at both Ningbo Nanlian and [HFTC5] in 1998."  Letter from Commerce to Arent Fox of 1/12/00,

---

[4]      The person referred to here as "Mr. Wei" is variously identified on the record and in the parties' papers as "Mr. Wei," "Philip Wei," or "Mr. Wei Wei."  No party to this action disputes that these various names refer to the same person, and the court will refer to him as Mr. Wei.

[5]      HFTC5 refused to participate in verification on the grounds that it "could not persuade [its] suppliers to cooperate."  Letter from law firm of Arent Fox Kintner Plotkin & Khan ("Arent Fox") to Commerce of 5/21/99, Pub. R. Doc. 56, at 1.

Pub. R. Doc. 141, at 1. NNL responded to this letter and claimed that Mr. Wei was not a

manager of HFTC5 during NNL's POR but was, since his resignation from HFTC5 on October

26, 1997, "a part-time independent consultant" to that company. *See* Letter from Arent Fox to

Commerce of 1/31/00, Pub. R. Doc. 146 at 4. NNL also stated that during its POR, Mr. Wei

"was not an officer or manager of Ningbo Nanlian either. He was a consultant." *Id*. at 2 n.1.

Commerce then published the results of its investigation. Based on evidence contained in

the antidumping duty questionnaires and gathered at NNL's verification (including Mr. Wei's

responses to questions about his relationships with NNL, HFTC5, and HFTC5's customers),

Commerce determined that the companies were "affiliated" and that their operations were

"intertwined." Final Results, 65 Fed. Reg. at 20,949. As a result, Commerce concluded that

NNL did not merit a separate rate from HFTC5, and assigned to it HFTC5's antidumping duty

margin of 201.63%. *See id*. (adopting reasoning set forth in Issues and Decision Mem. for the

Admin. Rev. of the Antidumping Duty Order on Freshwater Crawfish Tail Meat from the

P.R.C.—March 26, 1997 through August 31, 1998, Pub. R. Doc. 214 (Apr. 7, 2000)).

Subsequently Hontex filed a motion for judgment upon the agency record, and the court in

*Hontex I* remanded the matter to Commerce.

Pursuant to the court's instructions, Commerce conducted remand proceedings and

ultimately sustained its earlier finding that there was evidence that NNL and HFTC5 were

affiliated and that their operations were intertwined, and that NNL therefore did not merit a

separate antidumping duty rate from HFTC5. *See* Final Results of Determination Pursuant to

Court Remand ("Remand Results") at 2. Hontex argues here that the Remand Results do not clearly explain Commerce's collapsing methodology and fail to identify the existence of substantial evidence to support Commerce's decision to collapse the companies. *See* Comments on Def.'s Resp. to Remand at 4 ("Comments on Def.'s Resp.").

## STANDARD OF REVIEW

When reviewing a final determination in an antidumping or countervailing duty investigation, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a mere scintilla." *Consol. Edison*, 305 U.S. at 229. The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

## DISCUSSION

**I.        Exhaustion of Administrative Remedies**

Commerce issued its Draft Remand Results ("Draft Results") on August 4, 2003. Hontex was instructed to provide comments on the Draft Results by August 6, 2003 (i.e., in less than two

business days), but did not do so, on the grounds that it had no new information or arguments

that were not already addressed in its administrative and court briefs. *See* Pl.'s Surreply in Opp'n

to Def.'s Comments on Pl.'s Resp. to Remand ("Pl.'s Surreply") at 5. In its Response in

Opposition to Plaintiff's Comments upon Commerce's Final Results of Redetermination ("Def.'s

Resp."), Commerce argues that because Hontex failed to respond to the Draft Results, it

"frustrated the congressional goal of resolving disputes, where possible, at the agency level."

Further, by this failure to respond, Hontex did not allow Commerce "to address the argument[s]

[that Hontex now raises before the court] and thus prepare the issue for judicial review." Def.'s

Resp. at 5 (internal quotation omitted).

> For its part, Hontex maintains that

>> [f]irst, . . . by issuing the draft results on August 4, 2003, and requesting comments by August 6, 2003 (less than two business days), the Department deprived Plaintiff of any meaningful chance to provide the Department with comments on the draft results.

>> Second, after the exhaustive briefing and oral argument that has occurred in this case, this Court is quite familiar with the facts and law at issue. Even a cursory review of the Department's Remand Response reveals that it in fact points to no new facts or law to support the Department's determination. It is, in fact, a mere reorganization of facts and argument relied upon by the Department throughout these proceedings (administrative and judicial). Accordingly, it would have been futile for Plaintiff to submit comments to the Department on the draft results.

Pl.'s Surreply at 4.

> The doctrine of exhaustion "requires a party to present its claims to the relevant

administrative agency for the agency's consideration before raising these claims to the Court."

*Fabrique de Fer de Charleroi S.A. v. United States*, 25 CIT __, __, 155 F. Supp. 2d 801, 805

(2001) (internal citation omitted). In this Court, exhaustion of administrative remedies is

required "where appropriate," 28 U.S.C. § 2637(d) (2000), and is an absolute requirement only in

classification actions, with a limited exception for pre-importation classification rulings. *See,*

*e.g.*, *Crawfish Processors Alliance v. United States*, 28 CIT __, __, slip op. 04-47 at 46 (May 6,

2004); *Timken Co. v. United States*, 27 CIT __, __, 264 F. Supp. 2d 1264, 1284 (2003);

*Alhambra Foundry Co. v. United States*, 12 CIT 343, 346, 685 F. Supp. 1252, 1255 (1988). The

Court "enjoys discretion to identify circumstances where exhaustion of administrative remedies

does not apply." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003)

(citing *Cemex, S.A. v. United States*, 133 F.3d 897, 905 (Fed. Cir. 1998)). It is "generally

conceded that plaintiff is not required to perform an act which would be futile at the

administrative level." *Rhone Poulenc, S.A. v. United States*, 7 CIT 133, 135, 583 F. Supp. 607,

610 (1984).


Although Commerce argues that it was deprived of the opportunity "to address the

argument[s] and thus prepare the issue for judicial review," Def.'s Resp. at 5 (bracketing in

original), it is unable to cite any arguments made by Hontex to which it was unable to respond, or

any issues that had not been previously addressed at the administrative level or in this action.

Moreover, Hontex maintains, and the court agrees, that it had no new information or arguments

to which Commerce could have responded. Hontex had no new points to raise; thus, responding

to Commerce's Draft Results would have been a "useless formality." *Timken Co.*, 27 CIT at __,

264 F. Supp. 2d at 1284 (quoting *United States Cane Sugar Refiners' Ass'n v. Block*, 3 CIT 196,

201, 544 F. Supp. 883, 887 (1982)).  "A reviewing court usurps the agency's function when it

sets aside the administrative determination *upon a ground not theretofore presented* and deprives

the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its

action."  *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946)

(emphasis added) (footnote omitted).

Even had Hontex new information or arguments to present, Commerce's decision to

provide Hontex with less than two business days in which to submit its comments effectively

deprived it of any meaningful chance to comment on the Draft Results.  *See United States v. KAB*

*Trade Co.*, 21 CIT 297, 301 (1997) (internal citation omitted) (not reported in the Federal

Supplement) ("The court will dismiss an enforcement action for failure to exhaust administrative

remedies if Customs does not allow adequate time for defendants to respond."); *United States v.*

*Stanley Works*, 17 CIT 1378, 1382, 849 F. Supp. 46, 50 (1993) (where Commerce denied the

defendant an opportunity to respond by providing "a truncated response period," court dismissed

the action for failure to "provide [the defendant] with a reasonable opportunity to be heard . . .

."); *United States v. Chow*, 17 CIT 1372, 1376, 841 F. Supp. 1286, 1289–90 (1993) (internal

citations omitted) ("Because [Customs] failed to provide [defendant] with a 'reasonable

opportunity to make representations, both oral and written,' as to [his claim], the Court must

dismiss [Customs'] action for failure to exhaust its administrative remedies and for failure to

provide [defendant] with a fair opportunity to be heard . . . .").  Here, Hontex did not respond

because it had nothing new to add.  In addition, Commerce is foreclosed from making its

exhaustion argument by failing to give Hontex a reasonable time to respond.  Based on the

foregoing, the court finds that Hontex has satisfied any exhaustion of administrative remedies

requirement.

## II.      Commerce's Collapsing Methodology

### A.      In Accordance with Law

In *Hontex I*, the court found that, based on past precedent of this Court, Commerce's

practice of assigning entities a single antidumping duty margin—i.e., "collapsing" them into a

single entity—was a reasonable interpretation of the statute.  *See Hontex I*, 27 CIT __, __,  248 F.

Supp. 2d 1323, 1338 (2003); 19 C.F.R. § 351.401(f) (2000)[6]; *Koenig & Bauer-Albert AG v.*

---

[6]      This regulation provides:

Treatment of affiliated producers in antidumping proceedings—

(1)      In general.  In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.

(2)      Significant potential for manipulation.  In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:

(i)      The level of common ownership;

(ii)      The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and

(iii)      Whether operations are intertwined, such as

(continued...)

*United States*, 24 CIT 157, 160, 90 F. Supp. 2d 1284, 1287 (2000) ("Commerce's collapsing

practice has been approved by the court as a reasonable interpretation of the antidumping

statute.") (citing *Asociacion de Colombiana de Exportadores de Flores v. United States*, 22 CIT

173, 201, 6 F. Supp. 2d 865, 893 (1998); *Queen's Flowers de Colom. v. United States*, 21 CIT

968, 971–72, 981 F. Supp. 617, 622–23 (1997)).  In a market economy context, Commerce

follows several steps when determining whether producers should be collapsed:

> First, Commerce must determine whether two or more market
> economy producers are "affiliated." . . .  The next step in
> Commerce's market economy collapsing methodology is to
> determine whether producers share "production facilities for
> similar or identical products . . . ." . . .  Finally, Commerce must
> determine whether there is evidence that one affiliated producer
> has the "significant potential for the manipulation of price or
> production" of the other.

*Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1339 (internal citations omitted).


In *Hontex I*, the court reviewed Commerce's decision to apply its market economy

collapsing methodology to the NME exporters in this case, and summarized the methodology

used by Commerce:

> Commerce examined: (1) whether the [c]ompanies were
> connected–i.e., "affiliated"–through "operational control" between
> two "persons"; and (2) whether any such control relationship

---

⁶(...continued)

> through the sharing of sales information,
> involvement in production and pricing
> decisions, the sharing of facilities or
> employees, or significant transactions
> between the affiliated producers.

19 C.F.R. § 351.401(f).

presented the "significant potential for manipulation" of pricing or export decisions through "intertwining."

*Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1341 (footnote omitted). In addition, because NME exporters are involved here, Commerce expanded the market-economy inquiry into the "potential for manipulation" to include NME exporters' export decisions, rather than whether or not the companies share production facilities.

In reviewing Commerce's chosen methodology, the court will defer to Commerce "if [its chosen] method is based on a reasonable construction of the pertinent statutes." *Torrington Co. v. United States*, 82 F.3d 1039, 1046 (Fed. Cir. 1996); *see Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379 (Fed. Cir. 2001) ("We conclude that *Chevron* deference is afforded to Commerce's statutory interpretations as to the appropriate methodology. . . . "). After examining the methodology as applied in this case, the court in *Hontex I* found that

> to the extent that Commerce has followed its market economy collapsing regulations the NME exporter collapsing methodology is necessarily permissible. Where the NME exporter methodology departs from these regulations, however, the court must examine it to determine whether it is a permissible interpretation of the antidumping statute.

*Id*. at __, 248 F. Supp. 2d at 1342.

Because the court found that Commerce departed from its collapsing methodology, in certain respects, upon remand it instructed Commerce to "clearly set out the NME collapsing methodology used to reach the Final Results and clearly articulate why such methodology is a permissible interpretation of the antidumping statute. . . ." *Id*. at __, 248 F. Supp. 2d at 1350.

In the Remand Results, Commerce stated that in NME cases, government control of exporters is presumed. Thus, a single, country-wide antidumping duty rate is assigned to all exporters, unless an exporter can demonstrate that it is independent of government control. With respect to other types of control among exporters, however, Commerce stated:

> Neither the statute nor the regulations contain guidelines for determining when two or more NME exporters should receive the same rate for reasons *other* than being subject to government control. However, the export activities of two or more NME exporters may be "intertwined" by means other than government control, such that it is appropriate to treat such exporters as a single entity and to determine a single weighted-average margin for that entity. . . .

Remand Results at 5 (emphasis in original). Commerce stated that, in determining whether two or more NME exporters are intertwined, it

> may evaluate whether exporters in an NME context are controlling one another or are under the common control of another entity. We may also examine whether individuals in the employ of both companies are making, or are in the position to make, decisions concerning export sales, including decisions concerning export prices and terms of sale, for both companies.

*Id*. at 7. Thus, as it described its methodology in the Remand Results, Commerce first was required to determine whether or not the companies were "affiliated," and then determine whether a significant potential for manipulation of prices and/or export decisions[7] existed as a result of such affiliation. The court will address each factor in turn.

---

[7]     Because NME exporters are involved here, Commerce expanded the market-economy inquiry into the "potential for manipulation" to include NME exporters' export decisions.

### 1.    Affiliation

In evaluating whether NNL and HFTC5 were controlling one another or were under the

common control of another entity, Commerce first turned to the statutory definition of

"affiliated" as used in the context of a market economy, stating:

> We find the following control provisions of [19 U.S.C. § 1677(33)]
> to be instructive: (F) Two or more persons[8] directly or indirectly
> controlling, controlled by, or under common control with, any
> person; (G) Any person who controls any other person and such
> other person.  For  purposes of this paragraph, a person shall be
> considered to control another person if the person is legally or
> operationally in a position to exercise restraint or direction over the
> other person.

Remand Results at 5–6 (citing 19 U.S.C. § 1677(33) (1999)).[9]


Title 19 C.F.R. § 351.102(b) provides the criteria for deciding whether "control" exists.

The regulation states that

> the Secretary will consider the following factors, among others:
> corporate or family groupings; franchise or joint venture
> agreements; debt financing; and close supplier relationships.  The
> Secretary will not find that control exists on the basis of these
> factors unless the relationship has the potential to impact decisions
> concerning the production, pricing, or cost of the subject
> merchandise or foreign like product.  The Secretary will consider
> the temporal aspect of a relationship in determining whether
> control exists; normally, temporary circumstances will not suffice
> as evidence of control.

---

[8]    The court in *Hontex I* found that Commerce's decision to include within the scope of "persons" those entities identified as NME exporters was a reasonable interpretation of the antidumping duty statute. *Hontex I*, 27 CIT at__, 248 F. Supp. 2d at 1342.


[9]    Commerce applies this statutory definition in determining whether an NME exporter and its U.S. importer should be considered affiliated. *See* 19 C.F.R. § 351.102(b).

19 C.F.R. § 351.102(b).  Thus, in order for Commerce to find that two or more exporters are affiliated, one must control the other(s), or all of the exporters must be under common control. *See* 19 U.S.C. § 1677(33); *see also Firth Rixson Special Steels Ltd. v. United States*, 27 CIT __, __, slip op. 03-70 at 21 n.9 (June 27, 2003) (not reported in the Federal Supplement) ("The definition of 'affiliate' under U.S. international trade law implicates operational control.").

Once a finding of affiliation is made, the affiliated producers are treated as a single entity, or collapsed, for the purposes of calculating antidumping duty margins where Commerce concludes that, based on several factors,[10] there is "a significant potential for the manipulation of price or production."  19 C.F.R. § 351.401(f)(1) and (2); *see also China Steel Corp. v. United States*, 28 CIT __, __, slip op. 04-6 at 15 (Jan. 26, 2004) ("Commerce is precluded from concluding that a person controls another unless their relationship 'has the potential to impact decisions concerning the . . . pricing . . . of the subject merchandise.'") (internal citation omitted). Because NME exporters were involved here, Commerce also expanded the "potential to impact" to include export decisions, since "portions of the collapsing regulations were inapplicable to the extent that they addressed only market economy entities and not 'NME exporters' and their 'export decisions.'" *Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1340 (internal citations omitted).

_____

[10]      In a market economy situation, those factors include whether or not the producers

> have production facilities for similar or identical products that
> would not require substantial retooling of either facility in order to
> restructure manufacturing priorities and the Secretary concludes
> that there is a significant potential for the manipulation of price or
> production.

19 C.F.R. § 351.401(f)(1).

The court in *Hontex I* approved of Commerce's decision to include export decisions in its analysis, finding it to be "a sufficient articulation of Commerce's NME exporter collapsing methodology in the instant investigation as far as it goes," *Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1343; *see also Crawfish Processors Alliance*, 28 CIT at __, slip op. 04-47 at 49. However, the court cautioned that

> [s]imply increasing the scope of [Commerce's] analysis to include the [c]ompanies' "export decisions" . . . is insufficient. By regulation, in market economy situations, Commerce must consider the "temporal aspect of entities' relationships." . . . As it is not "clear . . . which set of factors formed the basis of Commerce's collapsing determination," the court cannot find Commerce's interpretation of "control" to be a permissible interpretation of the antidumping statute such that it is entitled to judicial deference.

*Id*. at __, 248 F. Supp. 2d at 1343–44 (internal citations omitted). Thus, the court instructed Commerce to "explain how the temporal aspect of the [c]ompanies' relationship affected its determination, and if the temporal aspect of the relationship was not taken into account, take it into account, or explain why [not] . . . ." *Id*. at __, 248 F. Supp. 2d at 1350.

Commerce addressed the court's instruction in the Remand Results, stating:

> In considering the extent to which control occurs in an NME context, the Department examines the temporal aspect of such control. While the Department does not "rule out the possibility that a short-term relationship could result in control," it does examine the extent to which control occurs across any given period of review.

Remand Results at 8 (internal citation omitted). Commerce also provided a time line detailing, in its view, the periods during which Mr. Wei's activities for NNL and HFTC5 overlapped,

finding that "Mr. Wei's actions on behalf of both companies spanned both periods [of review for

NNL and HFTC5] and did not constitute 'sporadic contacts' or 'temporary circumstances.'"

Remand Results at 27. Based on the foregoing, the court is satisfied that Commerce has

complied with its instructions to explain how the temporal aspect of the companies' relationship

affected its methodology and determination.

### 2.      Significant Potential for Manipulation

With respect to the significant potential for manipulation, the court In *Hontex I* stated:

> While the factors enumerated in 19 C.F.R. § 351.401(f)(2) for
> determining whether two entities are "intertwined" are non-
> exhaustive, the court cannot find Commerce's "articulation" of
> "intertwining" in the instant investigation to be a permissible
> interpretation of the antidumping statute because it is not "clear . . .
> which set of factors formed the basis of Commerce's collapsing
> determination."

*Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1344. The court then instructed Commerce to "state

with specificity the 'numerous factors' used to reach its finding that a 'significant potential for

manipulation' of pricing and export decisions existed . . . ." *Id*. at __, 248 F. Supp. 2d at 1350

(citations omitted in original).

In the Remand Results, Commerce described the factors it considered:

> First, the fact that Mr. Wei and the tandem of YFF and Louisiana
> Packing[11] were each legally or operationally in a position to
> exercise restraint or direction over (*i.e*., control) both HFTC5 and
> Ningbo Nanlian during the POR . . . necessarily leads to the

---

[11]      Yinxian No. 2 Freezing Factory ("YFF") and Louisiana Packing Company are the
joint owners of NNL.

> conclusion that there was significant potential for the manipulation of decisions on export prices and terms between these NME exporters. . . .

Remand Results at 25.  Commerce also considered

> whether Ningbo Nanlian and HFTC5's operations were intertwined, such as through the sharing of sales information, the sharing of employees, or significant transactions between the two entities.

*Id*. at 26.  Commerce further considered factors it considered appropriate in an NME context:

> In addition to examining the criteria in its collapsing regulation, however, it is also appropriate in an NME context, where the Department examines the export activities of NME exporters, to consider whether such operations are intertwined through the involvement in both entities' export decisions.  The Department examines both companies' export decisions because the export decisions are of primary concern to the Department in the NME context for purposes of assigning antidumping rates.

*Id*. at 8.

Based on the foregoing, the court finds that Commerce has stated with acceptable specificity the factors it took into account in reaching its conclusion concerning the "significant potential for manipulation." *See* 19 C.F.R. § 351.401(f)(2).  Thus, Commerce has satisfied the court's remand instructions by setting out its NME collapsing methodology.  The court will now address whether or not Commerce has provided substantial evidence to support its conclusion that NNL and HFTC5 should be collapsed according to such methodology.

**B.      Substantial Evidence**

**1.      "Web of Control Relationships" as Substantial Evidence of Control**

In *Hontex I*, the court stated:

> In concluding that a "web of control relationships" existed between NNL and HFTC5, Commerce stated that "numerous factors reflect that the relationship between these parties is such that there is potential to impact pricing and exports of the subject merchandise. . . . " Reviewing the record, however, the court is able to discern only one such "factor": the activities of Mr. Wei.

*Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1345 (internal citation omitted). The court therefore instructed Commerce to

> identify specific evidence on the record of: (1) how the activities and relationship of Mr. Wei with respect to NNL and HFTC5 constituted a "web of control relationships" such that [a] finding of affiliation between NNL and HFTC5 was justified; (2) how the activities and relationship of Mr. Wei with respect to NNL and HFTC5 could justify a finding that a "significant potential for the manipulation" of pricing and export decisions existed.

*Id*. at __, 248 F. Supp. 2d at 1350.

Although Commerce has made an effort to comply with these instructions, the precise nature of the supposed control relationship remains unclear both in the Final Results and the Remand Results. In the Remand Results, Commerce stated that "the Department must be prepared to address a situation in which one exporter that chooses not to cooperate, and is therefore assigned a high adverse facts available rate, seeks to channel exports through another exporter with a lower rate *over which it has control*." Remand Results at 7–8 (emphasis added). In other words, Commerce appears to be saying that to justify collapsing in this case, it must demonstrate that HFTC5, which chose not to participate in the verification process, was legally or operationally in a position to exercise control over NNL, which had a lower antidumping duty

rate than HFTC5. If this is Commerce's contention, however, it must fail because nowhere in the Remand Results does Commerce offer any evidence to support a contention that HFTC5 was in a position to control NNL.

Also in the Remand Results, however, Commerce appears to argue that both companies were subject to the potential for *common* control, through the activities of Mr. Wei, and that his activities resulted in significant potential for manipulation of both companies' export decisions. *See* Remand Results at 20. What remains unclear is whether this means that Commerce has found that Mr. Wei himself controlled both entities, or that he exercised control on behalf of another. Finally, as discussed under the heading "Close Supplier Relationships," *infra*, Commerce also argues that YFF and Louisiana Packing, as the joint venture owners of NNL, were in a position to control both NNL and HFTC5. The court will examine each contention in turn.

### a. Mr. Wei's Relationship with NNL

Commerce maintains that the record evidence supports the conclusion that Mr. Wei had the potential to control NNL. First, Commerce asserts that "Mr. Wei was in a legal and operational position to exercise restraint or direction over Ningbo Nanlian" because, according to NNL's business license, Mr. Wei was one of two members of NNL's management during the POR. *See* Remand Results at 10–11. Commerce further relies on its finding that Mr. Wei was asked by Mr. Lee, the sole owner of Louisiana Packing, to work on the formation of the joint venture between Louisiana Packing and YFF, the companies that formed NNL, and that Mr.

Wei's signature appears on the joint venture contract. *Id*. at 13. Commerce stated:

> It is reasonable to conclude that a founder of a small business entity would be unavoidably involved in setting up the business structure and operations of that entity. Thus, as a founder of Ningbo Nanlian, involved in setting up the business structure and operations for Ningbo Nanlian, Mr. Wei would have been in a position to exercise restraint or direction over Ningbo Nanlian, at the very least during the period over which the company was formed.

*Id*.

Although Mr. Wei was involved in setting up the joint venture involving NNL, Commerce's contention that, because Mr. Wei's signature appears on the joint venture contract, it necessarily follows that he "would have been in a position to exercise restraint or direction" over NNL, is unsupported by the record evidence. Mr. Wei stated at verification that he signed the contract on Mr. Lee's behalf—i.e., as his representative—because Mr. Lee did not have time to sign the documents himself. *See* Mem. from Thomas Gilgunn to Maureen Flannery of 3/13/00, Conf. R. Doc. 29, at 8 ("Verification Rep."). Mr. Lee confirmed that he considered Mr. Wei his "agent." *Id*. at 10. All of the evidence indicates that in setting up the joint venture, Mr. Wei was acting at Mr. Lee's direction. There is no indication that Mr. Wei had an ownership interest in NNL, which was a joint venture between Louisiana Packing, a U.S. importer and reseller of crawfish, and YFF, a Chinese-owned company.

Likewise, the court does not agree that the presence of Mr. Wei's name on NNL's business license is *ipso facto* proof of his control over NNL. Although Mr. Wei's name appears

on the business license, the evidence nevertheless does not support Commerce's conclusion that Mr. Wei had the potential to exercise control over NNL. Rather, the evidence tends to show that Mr. Wei's name appears on NNL's business license because Mr. Wei signed the joint venture contract as Mr. Lee's agent. *See* Verification Rep. at 8.

Next, Commerce relies upon the presence of Mr. Wei's approval stamp or "chop" (the equivalent of a signature in the United States) on various export documents and invoices as "[e]vidence of Mr. Wei's potential to influence, control or manipulate Ningbo Nanlian's U.S. sales efforts during the POR." Remand Results at 12. Commerce also points out that Mr. Wei represented NNL at verification, stating that "Mr. Wei's preparation and approval of 'various' sales and export documents, and his full participation in the verification of Ningbo Nanlian, constitute further evidence that Mr. Wei was operationally in a position to exercise restraint or direction over Ningbo Nanlian." *Id*.

Again, the evidence cited is not in any way probative of the facts Commerce hopes to establish. First, as to Mr. Wei's stamp of approval on export documents and invoices constituting proof of his potential to control NNL, these tasks are merely administrative, and were performed at Mr. Lee's request, so that Mr. Lee would know that Mr. Wei had prepared the documents, as the other NNL employees were unfamiliar with the shipping paperwork. *See* Verification Rep. at 8. In addition, Mr. Wei worked only on NNL's first few shipments to the United States. *See id*. After that, Mr. Wei stated, NNL employees grew more competent in handling this paperwork, and his services were no longer needed. *See id*. The

court is not convinced that Mr. Wei's activities rise to the level of exercising restraint or direction over NNL using the substantial evidence standard. Mr. Wei's activities consisted of approving and stamping routine paperwork, not controlling the company's prices or export decisions. *See* Conf. R. Doc. 32, Ex. 3, Lee Aff.

Finally, Mr. Wei's presence at NNL's verification is not substantial evidence that Mr. Wei was in a position to exert control over NNL. Commerce maintains that "Mr. Wei also represented Ningbo Nanlian at . . . verification, and fully participated in the verification process . . . . [Mr. Wei's] full participation in the verification of Ningbo Nanlian[] constitute[s] further evidence that Mr. Wei was operationally in a position to exercise restraint or direction over Ningbo Nanlian." Remand Results at 12. However, Mr. Wei's presence at verification was *specifically requested* by Commerce. *See* Letter from Commerce to Arent Fox of 2/23/00, Conf. R. Doc. 176, at 3 ("We will discuss Ningbo Nanlian's February 17, 2000 response with Ningbo Nanlian officials and with Mr. Wei. Please make certain that Mr. Wei is available for this portion of the verification."). Moreover, regardless of whether Mr. Wei's presence at verification was specifically requested or not, his presence and participation, without more, simply does not support the conclusion that Mr. Wei was in a position to exert control over NNL. In order to demonstrate control, Commerce must present evidence showing that Mr. Wei, by virtue of his activities with respect to NNL, would have been in a position to exert "restraint or direction" over the company. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). While Commerce is to weigh the evidence and may draw reasonable inferences

therefrom, the existence of substantial evidence is determined nonetheless "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin*, 322 F.3d at 1374 (quoting *Atl. Sugar*, 744 F.2d at 1562). Taken as a whole, the court finds that substantial evidence does not support Commerce's contention that Mr. Wei's activities for NNL gave him the potential for control of that company. The court will now examine the nature of Mr. Wei's relationship with HFTC5.

### b.      Mr. Wei's Relationship with HFTC5

The parties do not dispute the substance of Mr. Wei's activities for HFTC5 during the POR. *See* Comments on Def.'s Resp. at 14. During that time, Mr. Wei acted as HFTC5's representative and identified himself as the company's "assistant to the general manager." *See* Verification Rep. at 7. According to its organizational chart, HFTC5 employed three Vice Managers, all of whom served under one General Manager, the highest-level manager in the company. *See* HFTC5's Sec. A Resp., Ex.1. Mr. Wei discussed, negotiated, and signed sales contracts between HFTC5 and other companies, and corresponded with the United States Customs Service ("Customs")[12] on HFTC5's behalf. Remand Results at 15–16. Mr. Wei was paid by HFTC5 for his work. *Id*. at 16.

Because HFTC5 did not participate in verification, Commerce claims that it

---

[12]      Effective March 1, 2003, the Customs Service was renamed the Bureau of Customs and Border Protection. *See* Reorganization Plan Modification for the Dep't of Homeland Security, H.R Doc. 108-32, at 4 (2003).

> never had the opportunity to establish the accuracy of HFTC5's claims that Mr. Wei was not a manager, or that he did not have the potential to exercise restraint or direction over HFTC5." Nevertheless, . . . evidence on the record demonstrates that Mr. Wei was the vice general manager of HFTC5 during the POR (and was therefore in a position to exercise restraint or direction over HFTC5).

*Id.* at 18.  Although HFTC5 did not participate at verification, Mr. Wei did.  Mr. Wei stated at verification that the general manager of HFTC5 sought his assistance because Mr. Wei "was familiar with the crawfish business, spoke English, and had contacts with many of HFTC5's U.S. customers."  Verification Rep. at 6.  Mr. Wei's contacts with HFTC5's customers were "[u]pon HFTC5's request," and his correspondence with Customs was "at the request of the general manager [of] HFTC5."  *Id.*  Therefore, it does not appear that Mr. Wei was in a position to take any independent actions with respect to HFTC5, or otherwise had the potential to exercise restraint or direction over the company.  Moreover, Mr. Wei stated that he used the "Vice General Manager" title in order to gain credibility with Customs.  *See* Conf. R. Doc. 32, Ex. 1, Wei Aff.  Although Mr. Wei held himself out as the "Vice General Manager" of HFTC5 on numerous occasions during the POR, the court finds no evidence on the record to indicate that the use of this title actually conferred upon Mr. Wei the potential to exercise control over HFTC5.  In addition, Commerce cited no evidence tending to indicate that Mr. Wei was in a position to determine that HFTC5 should direct exports to take advantage of NNL's lower rate.  Finally, Commerce at no point stated that it found Mr. Wei's testimony to be either incredible or evasive.[13]

---

[13]     The court's review of the record yielded only two instances in which Mr. Wei or his testimony could be called into question.  First, Commerce cited Mr. Wei's behavior in failing

(continued...)

In sum, Commerce has not provided substantial evidence to show that Mr. Wei was in a position of control with respect to either company, let alone both companies. Rather, the evidence tends to show that Mr. Lee, not Mr. Wei, was in a position to exert control over NNL, and that Mr. Lee directed all of Mr. Wei's activities at NNL. There is no evidence, however, to indicate that Mr. Lee was in a like position with HFTC5. Because neither Mr. Wei nor Mr. Lee had the potential for control at *both* companies, the statute is not satisfied, since the statutory definition of affiliation requires that "two or more" companies be "controlled by, or under common control with, any person." 19 U.S.C. § 1677(33).[14] Moreover, Commerce

---

[13](...continued)
to produce bank records for any payments he received from NNL or HFTC5. *See* Verification Rep. at 1. As for Mr. Wei's testimony, Commerce stated with respect to his relationship with NNL, "Mr. Wei initially stated that he did not have a relationship with Ningbo. However, Mr. Wei later revealed that Mr. Lee asked him to help set up Ningbo in 1998." *Id*. at 7. Taken as a whole, however, the record indicates that Commerce considered Mr. Wei's testimony to be truthful, and at no time did Commerce state otherwise.

[14]      Title 19 C.F.R. § 351.102(b) provides the criteria for deciding whether "control" exists in a market economy setting. The factors include, *inter alia*, corporate or family groupings, franchise or joint venture agreements, debt financing, and close supplier relationships. *See, e.g.*, *New World Pasta Co. v. United States*, 28 CIT __, __, slip op. 04-18 at 12 (Mar. 1, 2004) (common control found where one company's major shareholders included a sister and sister-in-law of a second company's major shareholder); *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 23 CIT 804 (1999) (not reported in the Federal Supplement) (a combination of control factors contributed to the finding of affiliation, such as Ta Chen's possession of a signature stamp for the disbursements of a second company, Sun; Ta Chen's unlimited monitoring of Sun's accounts payable, accounts receivable, and inventory; and the existence of a debt financing agreement between Ta Chen and Sun). Although "[t]he traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm 'operationally in a position to exercise restraint or direction' over another even in the absence of an equity relationship[,] . . . equity ownership remains a highly relevant consideration in determining whether parties are affiliated through common control . . . ." *Corus Staal BV v. United States*, 27 CIT __, __, 259 F. Supp. 2d 1253, 1266 (2003) (internal citation omitted); *see also China Steel*, slip op. 04-6 at 8 (substantial control was found based on five factors, including acquisition by China Steel of a significant percentage of another

(continued...)

provided no evidence to support its contention that HFTC5 had control over NNL as a result of Mr. Wei's activities. *See* Remand Results at 7–8. For these reasons, the court finds that the activities of Mr. Wei are not sufficient to demonstrate control such that the two companies should be collapsed.

### c.    Temporal Aspects of the Control Relationship

In connection with Mr. Wei's activities, Commerce must also consider other matters, pursuant to 19 C.F.R. § 351.102(b), in deciding whether "control" exists. Among them is the caveat, "The Secretary will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control." 19 C.F.R. § 351.102(b).

In *Hontex I*, the court interpreted Commerce's regulation regarding the temporal aspects of a control relationship "to mean that Commerce must weigh the nature of entities' contacts over time, and must determine how such contacts potentially impact each entity's business decisions. Sporadic or isolated contacts between entities, absent significant impact, would be less likely to lead to a finding of control." *Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1344 n.17. On remand, Commerce provided a time line to show the overlap in Mr. Wei's activities for both companies in order to support its contention that Mr. Wei acted for NNL and HFTC5 simultaneously and repeatedly. *See* Remand Results at 27–29. Regarding the time line,

---

[14](...continued)
company's stock).

Commerce stated:

> In sum, far from providing "occasional" assistance with translating documents and using his English skills, as Mr. Lee claimed Mr. Wei did, the fact remains that record evidence demonstrates that Mr. Wei served as a Vice General Manager for both Ningbo Nanlian and HFTC5 in overlapping periods during the POR and contributed significant time and efforts to both companies.

*Id*. at 30.

The time line itself, however, does not support these conclusions. Although it is true that Mr. Wei was employed by both NNL and HFTC5 during the same period of time, merely demonstrating that the companies shared an employee, without more, is not sufficient to demonstrate control. *See Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1350. Commerce must also show that the companies' contacts through Mr. Wei were substantial enough to warrant a finding of control. *See id*. at __, 248 F. Supp. 2d at 1344 n.17. Here, Commerce's time line indicates that, from March 1997 through at least October 1997, Mr. Wei was an employee of HFTC5. *See* Remand Results at 27. After Mr. Wei's resignation on October 26, 1997, he continued to perform work for HFTC5. *Id*. On December 15, 1997, HFTC5 paid Mr. Wei for work completed from October 27, 1997, through December 31, 1997. *Id*. at 28.

On January 21, 1998, Mr. Wei invited several representatives of one of HFTC5's customers to visit HFTC5 in the coming months to discuss the frozen crawfish business. Two days later, on January 23, 1998, while still performing work for HFTC5, Mr. Wei was identified as Vice Chairman and Vice General Manager on a business license issued to NNL. *Id*. at 28.

From March 4, 1998, through November 25, 1998, Mr. Wei continued to perform activities for

HFTC5, including contacting Customs on HFTC5's behalf. During a five-month overlapping

period, from April 1, 1998, through August 31, 1998, Mr. Wei was paid by Mr. Lee for work

completed on behalf of NNL.

Thus, from January 23, 1998, through August 31, 1998, Mr. Wei performed work for

both HFTC5 and NNL. During this time, Mr. Wei was identified, or identified himself, as the

"Vice General Manager" for both companies. Based on this representation, Commerce urges the

court to find that Mr. Wei actually served as the Vice General Manager for both companies,[15] and

was therefore in a position to exert control over both of them.

The court finds that regardless of Mr. Wei's job title, his activities for each company were

very different, and in neither case do his activities constitute substantial evidence for a finding of

control. Thus, Commerce's inference is refuted by the actual evidence. The vast majority of Mr.

Wei's activities during NNL's POR were for HFTC5. His duties included writing letters,

contacting U.S. customers, signing sales documents, and attending trade fairs on behalf of

HFTC5. Remand Results at 27. However, after his resignation from HFTC5 in October

1997—before NNL's POR began—Mr. Wei was no longer a day-to-day employee of HFTC5.

*See* Verification Rep. at 6 ("Mr. Wei explained that the general manager of HFTC5 would

*sometimes* contact him for assistance because he was familiar with the crawfish business, spoke

---

[15]     While he was identified in various places as the Vice General Manager for both
companies, it is beyond dispute that Mr. Wei resigned from HFTC5 on October 26, 1997. *See*
Comments on Def.'s Resp. at 14; Remand Results at 14.

English, and had contacts with many of HFTC5's U.S. customers.") (emphasis added). Rather,

his work for the company became consultative in nature, as evidenced by the fact that he was

under no contract with HFTC5 and was not paid a salary.[16] *See id.* at 7 ("[Mr. Wei] stated that he

considered himself to be a 'consultant' to HFTC5 and that he still performs services for them

*periodically*.") (emphasis added). Thus, Mr. Wei performed work for HFTC5 only

intermittently, upon request.

During this same period, Mr. Wei's activities at NNL consisted solely of stamping his

name on export documents for NNL's first few shipments to the United States, since none of the

individuals working for NNL had any experience in exporting the product from China. *See*

Verification Rep. at 8. Mr. Wei stamped the documents with his name so that when Mr. Lee

received them, he would know that Mr. Wei had prepared them. *See id.* Mr. Wei stated that he

stopped working for Mr. Lee after NNL's first few shipments. *Id.* at 9. He also indicated

that helping to set up the joint venture that formed NNL and stamping the export documents

"were the only services that he performed with regard to Ningbo." *Id.* at 8.

For his part, Mr. Lee described Mr. Wei as his agent, and indicated that although he

had wanted to make Mr. Wei a full-time employee of NNL, Mr. Wei declined on the grounds that

he did not like Ningbo city and missed his family. *See id.* at 10. Thus, much like his association

---

[16]     Mr. Wei stated at verification that he was not on HFTC5's payroll after his resignation in October 1997. *See* Verification Rep. at 5. After his resignation, HFTC5 paid Mr. Wei two lump-sum cash payments, one in November 1997 and the other in November 1998. *See id.* at 9.

with HFTC5, Mr. Wei's work for NNL appears to be intermittent, limited to a few instances at

Mr. Lee's request, and was by no means day-to-day employment.  This is further evidenced by

the fact that Mr. Wei declined full-time employment with NNL; only "rarely" performed work

for NNL after its first few shipments; had no contract with Mr. Lee, NNL, or any other

related company; and was paid, in cash, directly by Mr. Lee, not by NNL or any other

company.  *See id.* at 8–9.  Thus, any authority that Mr. Wei may have had to manipulate prices

would have come directly from Mr. Lee, as part-owner of NNL.  The potential to *control*

NNL remained with Mr. Lee, not Mr. Wei.


   Based on the foregoing, the court finds that although Commerce has demonstrated that

Mr. Wei performed work for both NNL and HFTC5 for the duration of NNL's POR, "Mr. Wei's

mere employment by both NNL and HFTC5 will not be found to justify" a conclusion that Mr.

Wei exercised sufficient control over both entities such that they should be collapsed.  *Hontex I*,

27 CIT at __, 248 F. Supp. 2d at 1350.  Moreover, Commerce's time line and Mr. Wei's

undisputed verification responses both indicate that Mr. Wei's activities for HFTC5 occurred on

an intermittent basis, and that Mr. Wei's activities for NNL—assisting Mr. Lee in setting up

the joint venture forming NNL, and stamping the export documents for NNL's first few

shipments to the United States—were limited to a few isolated instances.  *See* Verification Rep.

at 7–8; *see also* Remand Results at 27–29.  Indeed, the court is not convinced that substantial

evidence supports the conclusion that Mr. Wei was in a position to exercise control over either

company.  Moreover, Commerce has not presented any substantial evidence to show that Mr.

Wei's contacts with the companies "impact[ed] each entities' business decisions." *Id.* at __, 248

F. Supp. 2d at 1344 n.17.

### d.       Close Supplier Relationships

In order to support a finding of control, 19 C.F.R. § 351.102(b) directs Commerce to consider, among other factors, the existence of "close supplier relationships" among the companies under investigation.  However, Commerce is precluded from finding control on the basis of a close supplier relationship "unless the relationship has the potential to impact decisions concerning the . . . pricing[17] . . . of the subject merchandise. . . . " 19 C.F.R. § 351.102(b); *see also China Steel Corp. v. United States*, 28 CIT __, __, slip op. 04-6 at 15 (Jan. 26, 2004).  A close supplier relationship is one "in which the supplier or buyer becomes reliant upon the other." *Corus Staal,* 27 CIT at __, 259 F. Supp. 2d at 1266.

In a market economy context, such relationships "may constitute sufficient control to satisfy 19 U.S.C. § 1677(33)(G)," though the term "close supplier relationship" is not specifically defined.  *Mitsubishi Heavy Indus., Ltd. v. United States*, 23 CIT 326, 333, 54 F. Supp. 2d 1183, 1190 (1999) (citing Statement of Administrative Action, H.R. Doc. No. 103-316, 103d Cong., 2nd Sess., (1994), at 4174–4175, *reprinted in* Uruguay Round Agreements Act, Legislative History, Vol. VI, at 838 ("SAA")).  Where "Congress leaves a term undefined, it is within Commerce's discretion to develop the meaning of the term on a case-by-case basis so long as its application in a given case is reasonable." *Id*. at 333, 54 F. Supp. 2d at 1190–91.

---

[17]       Because NME exporters are involved here, Commerce expanded the market-economy inquiry regarding the potential to impact pricing to also include the potential to manipulate NME exporters' export decisions.

To that end, in *Hontex I* the court instructed Commerce to "detail the manner in which

NNL and HFTC5 were 'little more than separate distribution channels from the same producer to

the same customer'[18] during NNL's POR." *Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1350

(citation omitted from original). In the Remand Results, Commerce "conclude[d] that [Company

A] and [Company B][19] (the joint venture owners of Ningbo Nanlian) had the ability to

control HFTC5 and Ningbo Nanlian by virtue of their positions as supplier and U.S. importer for

each entity." Remand Results at 20. Thus, although Commerce did not employ the "separate

distribution channels" language of the remand instructions in *Hontex I*, the court understands

Commerce's argument with respect to Companies A and B to be in response to those

instructions. In other words, Commerce appears to argue that NNL and HFTC5 were merely

separate distribution channels from the same producer (Company A) through the same U.S.

importer (Company B) during NNL's POR.


In 1997, HFTC5 purchased 100% of the crawfish produced by Company A. Also in

1997, 45% of the crawfish tail meat sold in the United States by HFTC5 was supplied by

Company A, and sold through Company B. The following year, in 1998, NNL purchased 100%

---

[18]    This language appears to be echoed by the language employed in the Remand Results, where Commerce stated that "the Department must be prepared to address a situation in which one exporter that chooses not to cooperate, and is therefore assigned a high adverse facts available rate, *seeks to channel exports through another exporter* with a lower rate over which it has control." Remand Results at 7–8 (emphasis added).

[19]    The court will refer to YFF and Louisiana Packing as Company A and Company B, respectively, for ease of reading while maintaining confidentiality.

of the crawfish produced by Company A, and made 100% of its U.S. sales through Company B.[20]

Commerce further maintains that "[t]he relationships between these entities were long-term,

covering entire production seasons. HFTC5 and Ningbo Nanlian were also both exporting to the

United States during that portion of the POR applicable to both entities (i.e., April 1, 1998 to

August 31, 1998)." *Id.*

Commerce's main argument, then, is that because HFTC5 and NNL each purchased their

crawfish, in 1997 and 1998, respectively, exclusively from Company A, Company A had the

potential to impact both companies' business decisions, an essential element of control. *See*

Remand Results at 20 ("[Commerce] also concludes that [Company A and Company B] (the

joint venture owners of Ningbo Nanlian) had the ability to control HFTC5 and Ningbo Nanlian

by virtue of their positions as supplier and U.S. importer for each entity."[21] The court agrees that

---

[20]     Based on this evidence, Commerce stated:

> Thus, YFF, HFTC5, and Louisiana Packing were reliant upon one
> another for a major portion of HFTC5's U.S. sales during the POR.
> Furthermore, because during the POR, 100 percent of the crawfish tail
> meat sold in the United States by Ningbo Nanlian was supplied by YFF
> and sold through Louisiana Packing, Ningbo Nanlian was reliant upon
> both YFF and Louisiana Packing for its U.S. sales during the POR.

Remand Results at 21.

[21]     Commerce stated:

> Ningbo Nanlian was a joint venture, formed and owned by YFF and
> Louisiana Packing. Entities that are the founders and owners of a third
> entity would certainly have the potential to impact business decisions of
> the third entity. Company A and Company B would have further influence
> over Ningbo Nanlian by virtue of their roles as Ningbo Nanlian's

(continued...)

Commerce could justifiably infer that Company A and Company B had the potential to impact

business decisions at NNL. Company A and Company B jointly owned NNL, and were NNL's

exclusive supplier and importer, respectively, to the United States in 1998. There is also

evidence on the record that one individual, Mr. Lee, was both the owner of Company B and

a part-owner of NNL.

With respect to HFTC5, however, the court finds that Commerce has not sufficiently

demonstrated how Company A and Company B would have the ability to influence the business

decisions of that company. The one connection that Commerce cites—that Company A was a

major supplier to HFTC5—is not sufficient. This is particularly true in 1998 when HFTC5 sold

none of its crawfish through Company B and Company A supplied none of its product to

HFTC5. The court finds *Ta Chen* instructive on this point. In *Ta Chen*, Commerce concluded

that Ta Chen and another company, Sun, had a close supplier relationship because Sun

distributed only Ta Chen products in the United States. *See* 23 CIT at 811. Ta Chen argued that

although Sun bought all of its product from Ta Chen, it was at liberty to buy from other

producers as well, and in any event "Commerce recognizes that [exclusive] contracts are

'common commercial arrangements,' and that affiliated party status does not necessarily arise

---

[21](...continued)
> exclusive supplier and exclusive U.S. importer, respectively. Similarly, Company A and Company B would have the ability to influence the business decisions of HFTC5 (though Company A was a major, but not exclusive, supplier of HFTC5).

*Id*. at 22.

from a customer buying all of its product from one supplier." *Id*. (internal citation omitted).

The situation in *Ta Chen* is useful when examining the facts before the court.  Here, Commerce claimed that a close supplier relationship existed between NNL and HFTC5, since Company A sold 100% of its crawfish to HFTC5 in 1997, and sold 100% of its crawfish to NNL the following year.  As in *Ta Chen*, however, there is no evidence to suggest that HFTC5 had any difficulty obtaining crawfish from other suppliers in 1998, the year in which Company A sent all of its output to NNL.  Nor is there any evidence that Company A was HFTC5's exclusive supplier; to the contrary, Commerce acknowledged that Company A was a major, but *not* exclusive, supplier of HFTC5.  *See* Remand Results at 22.  Moreover, even where there are exclusive sales contracts, Commerce has found that insufficient for an affiliation finding.  *See Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea*, 62 Fed. Reg. 18,404, 18,441 (ITA Apr. 15, 1997) (final results) ("The arrangements [respondent] has entered into with its home-market distributors are simply exclusive sales contracts which are a common commercial arrangement all over the world.  These arrangements are typically made at arm's length and do not normally indicate control of one party over the other.").

Moreover, Company A sold 100% of its crawfish to HFTC5 in 1997, the year *before* NNL was formed.  Company A then sold 100% of its crawfish to NNL the following year.  It is therefore difficult to see how Company A could be in a position to control HFTC5 in 1998, when it sold none of its product to HFTC5 in that year.  And, because NNL did not yet exist in 1997, the year that Company A sold all of its product to HFTC5, there was no temporal overlap

between Company A's sales to HFTC5 and its sales to NNL.

### e. Mr. Lee/Company B and NNL/HFTC5

Commerce further contends that Mr. Lee, as both the sole owner of Company B and 44% owner of NNL, was "legally or operationally in a position to exercise restraint or direction over the operations of both NNL and HFTC5." Remand Results at 22. Commerce stated that Mr. Lee

> had the ability to exercise direction over NNL, as evidenced by the fact that Mr. Lee himself directed Mr. Wei to set up the Ningbo Nanlian joint venture, and work on the company's crawfish tail meat export sales efforts during the POR, and by the fact that Mr. Lee participated in the Ningbo Nanlian verification as a representative and co-owner of Ningbo Nanlian, answering questions and providing explanations on . . . Ningbo Nanlian's behalf.

*Id*. at 22–23. With respect to Mr. Lee's involvement with HFTC5, Commerce maintains that

> Mr. Lee had actually been paying the antidumping legal fees of HFTC5. It stands to reason that, in paying HFTC5's legal fees, Mr. Lee was taking some degree of responsibility for HFTC5's U.S. sales activities during the POR. After all, antidumping legal fees are a business expense attributable to HFTC5's U.S. sales of crawfish tail meat. It is therefore also reasonable to infer that Mr. Lee had some actual–or at the very least, potential–control over HFTC5's U.S. sales activities during the POR.

*Id*. at 23.

The court agrees that the evidence tends to justify Commerce's inference that Mr. Lee, as a founder and co-owner of NNL, likely had the potential to exercise control over NNL. However, the court is not convinced that Mr. Lee's payment of antidumping for HFTC5

gives rise to an inference that Mr. Lee had the potential to control HFTC5's U.S. sales

activities during the POR. Commerce's use of language such as "it stands to reason" does not

justify its conclusions in the absence of substantial evidence. "Conjectures are not facts and

cannot constitute substantial evidence." *China Nat'l Mach. Imp. & Exp. Corp. v. United States*,

27 CIT __, __, 264 F. Supp. 2d 1229, 1240 (2003); *see also China Nat'l Arts & Crafts Imp. and*

*Exp. Corp. v. United States*, 15 CIT 417, 424, 771 F. Supp. 407, 413 (1991) ("Guesswork is no

substitute for substantial evidence in justifying decisions."). Based on the evidence, the court

finds that merely paying HFTC5's legal fees does not demonstrate that Mr. Lee was in a

position to exercise control over HFTC5.


### f.       Cooperation

Although Mr. Wei described the two companies as competitors, Commerce maintains

that they were in fact cooperative. As evidence of this cooperation, Commerce stated that

> throughout the administrative review, HFTC5 provided Ningbo
> Nanlian with numerous documents (several of which contained
> significant quantities of business proprietary information), which
> Ningbo Nanlian then submitted to the Department on its own
> behalf. In fact, one of Ningbo Nanlian's responses contains several
> proprietary documents of HFTC5 that actually reveal HFTC5's
> U.S. customers.

Remand Results at 23.


However, Commerce's Verification Agenda reveals that Commerce specifically asked

NNL to provide information about HFTC5. *See* Letter from Commerce to Arent Fox of 2/23/00,

Pub. R. Doc. 176, Attach. at 2 (indicating that NNL would be required to present at verification

"[a]ny additional correspondence that Mr. Wei has been able to obtain from HFTC (5) in addition to that provided in your February 17, 2000 response."). Thus, NNL requested the documents in question from HFTC5 in order to comply with Commerce's request. With respect to Commerce's request, the court in *Hontex I* stated:

> Specifically, Commerce asked that NNL provide information about payments Mr. Wei received from HFTC5 beginning in June of 1997, as well as information about his business relationship with HFTC5, the services he provided to HFTC5, and the nature of his involvement with HFTC5's customers following his "resignation" from that company on October 26, 1997. NNL timely submitted responses to this supplemental questionnaire.

*Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1327 (internal citation omitted). In the Verification Report, Commerce noted that "Mr. Wei contacted HFTC5 and requested various documents but that HFTC5 only sometimes complied with his requests." Verification Rep. at 6 n.4. The fact that Mr. Wei, on behalf of NNL, was successful in obtaining some documentation from HFTC5 is not sufficient to support Commerce's conclusion that this constitutes "evidence of cooperation between the two entities that should be considered" in determining whether the two companies were under common control. Remand Results at 23–24.

### 2.    Significant Potential for Manipulation of Pricing and Export Decisions

In its analysis of whether Mr. Wei had the potential to manipulate pricing and export decisions for NNL and HFTC5, Commerce relied on 19 C.F.R. § 351.401(f)(2)(ii)–(iii), which provide that in identifying "a significant potential for the manipulation of price or production," Commerce may consider

(ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and

(iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f)(2)(ii)–(iii).  With respect to these factors, Commerce stated:

Mr. Wei was a high level managerial employee for both Ningbo Nanlian and HFTC5, who was regularly involved, as the record evidence demonstrates, in the selling and exporting functions of both companies during the same period.  Section 351.401(f)(2)(iii) considers the very factual situation at issue in this case as one that would lead to a significant potential for manipulation of pricing and export decisions. . . .  Mr. Wei's positions at both companies as a high level manager would naturally result in Mr. Wei having access to the business plans for both companies, and the business contacts for both companies, as well as having the ability to communicate information between the two companies that would normally be kept confidential between two businesses that consider themselves competitors.

Remand Results at 30–31.

As stated above, Commerce asserts that Mr. Wei was "regularly involved" in the selling and exporting functions of NNL.  However, the record evidence indicates that the extent of Mr. Wei's "selling and exporting" functions consisted of approving and stamping routine export documents, not controlling the company's prices or export decisions.  *See* Conf. R. Doc. 32, Ex. 3, Lee Aff.  Even if approving and stamping the export paperwork did put Mr. Wei in a position to manipulate prices at NNL, potential for manipulation must not be confused with potential for control.  With respect to NNL, Mr. Wei would have been merely the *instrument* for manipulation; control rested with Mr. Lee, at whose request all of Mr. Wei's activities were

conducted. Thus, regardless of whether Mr. Wei had the ability to manipulate prices at NNL, the potential for ultimate control of that company would rest with the part-owner, Mr. Lee, not Mr. Wei.

Likewise, Mr. Wei's activities at HFTC5 consisted of writing letters, contacting U.S. customers, signing sales documents, and attending trade fairs on behalf of HFTC5. *See* Remand Results at 27. By signing sales documents, Mr. Wei may have been in a position to manipulate prices at HFTC5. However, Mr. Wei stated at verification that all of HFTC5's salespeople had the authority to sign sales contracts. *See* Verification Rep. at 6. More importantly, all of Mr. Wei's activities were "upon HFTC5's request," and under the direction of that company's general manager. *Id*. Thus, Mr. Wei would not have been in a position to exert control over HFTC5.

Pursuant to 19 C.F.R. § 351.401(f)(2)(iii), Commerce also considered "significant transactions" between NNL and HFTC5 in determining whether significant potential for manipulation existed. Commerce stated:

> In this case, NNL's owner, [Company A], regularly sold its crawfish to HFTC5. HFTC5, in turn, sold its crawfish to [Company B], Ningbo Nanlian's other owner. However, in the year after the antidumping duty order was issued, Company A shifted all of its output from HFTC5, where Mr. Wei was a high-level manager, to Ningbo Nanlian, a joint venture between Company A and Company B, which was set up by Mr. Wei. At that precise time, Company B switched its imports from HFTC5 and became Ningbo Nanlian's exclusive importer.

Remand Results at 32–33 (internal citations omitted). In other words, both of NNL's owners had transacted business with HFTC5 in 1997, the year before NNL was formed. After NNL was

formed in 1998, however, its owners dealt exclusively with their own creation, NNL, instead of HFTC5. At no time does Commerce claim that NNL's owners transacted business with both NNL and HFTC5 simultaneously. Thus, the circumstance that NNL's owners dealt with HFTC5 *before* NNL's formation, then dealt exclusively with NNL after its formation, does not support Commerce's conclusion that there were "significant transactions between the affiliated producers."

CONCLUSION

The court finds that Commerce has not provided substantial evidence to support its conclusion that NNL and HFTC5 were affiliated and should therefore be collapsed. On remand, Commerce shall revisit its finding with respect to affiliation. If it should conclude that its findings on remand with respect to affiliation are justified, it shall explain specifically and in detail, with reference to specific documents and page numbers in the record, what person or entity was in control of each company (NNL and HFTC5) during particular time periods, as well as what person or entity, if any, exercised common control over the companies. Commerce shall further state precisely how control was exercised, and the basis for its conclusions. Commerce shall also explain in detail, with reference to specific documents and page numbers in the record, the following:

> (1) In light of the court's findings with respect to the nature of Mr. Wei's activities for NNL and HFTC5, what evidence, if any, demonstrates how Mr. Wei's involvement with each company constituted the potential to control both entities; and how his simultaneous employment by both companies justified the conclusion that the companies' contacts through Mr. Wei were substantial enough to warrant a finding of control by Mr. Wei;

(2) How Mr. Lee's payment of antidumping legal fees for HFTC5 justified the finding that Mr. Lee was legally or operationally in a position to exercise restraint or direction over the operations of HFTC5;

(3) What evidence, if any, supports the conclusion that NNL and HFTC5 cooperated with one another;

(4) What evidence, if any, supports the conclusion that Mr. Wei had the "significant potential" for manipulation of pricing and export decisions of both companies; and

(5) What evidence, if any, supports the conclusion that Company A and Company B had the potential to exert control over HFTC5 in both 1997 and 1998. Commere shall consider that in order to support a finding of control on the basis of a close supplier relationship, it must provide evidence to show how Company A and Company B were in a position to impact pricing, exports, or other business decisions at HFTC5.

In particular, Commerce must state not only the evidence relied upon and the conclusion reached, but also the reasoning that led Commerce to its conclusion and a detailed explanation of any inferences drawn. If Commerce finds that the record evidence does not support its conclusions, Commerce shall reconsider whether its reliance on such evidence is well-founded.

Remand results are due within ninety days of the date of this opinion, comments are due thirty days thereafter, and replies to such comments eleven days from their filing.

                                                          /s/ Richard K. Eaton
                                                          Richard K. Eaton

Dated: May 21, 2004
       New York, New York