SLIP OP. 05-116

UNITED STATES COURT OF INTERNATIONAL TRADE

_____ :
                                  :
HONTEX ENTERPRISES, INC.,         :
D/B/A LOUISIANA PACKING CO.,      :
                                  :
        Plaintiff,                :
                                  :
            v.                    :
                                  : Before:  Richard K. Eaton, Judge
UNITED STATES,                    :
                                  :
        Defendant,                : Court No. 00-00223
                                  :
          and                     : PUBLIC VERSION
                                  :
CRAWFISH PROCESSORS ALLIANCE,     :
THE LOUISIANA DEPARTMENT OF       :
AGRICULTURE AND FORESTRY,         :
AND BOB ODOM, COMMISSIONER,       :
                                  :
        Defendant-Intervenors.    :
_____  :

OPINION AND ORDER

Dated: August 31, 2005

[United States Department of Commerce's antidumping duty review
determination on crawfish tail meat from China remanded]

    *Coudert Brothers LLP* (*John M. Gurley* and *Matthew J.
McConkey*), for the plaintiff.

    *Peter D. Keisler*, Assistant Attorney General, Civil
Division, United States Department of Justice; *David M. Cohen*,
Director, Commercial Litigation Branch, Civil Division, United
States Department of Justice; *Jeanne E. Davidson*, Deputy
Director, International Trade Section, Commercial Litigation
Branch, Civil Division, United States Department of Justice
(*David S. Silverbrand*); of counsel, Office of the Chief Counsel
for Import Administration, United States Department of Commerce
(*Marisa Beth Goldstein*), for the defendant.

    *Adduci, Mastriani & Schaumberg, L.L.P.* (*James Taylor, Jr.*
and *Will E. Leonard*), *John C. Steinberger*, of counsel, for the
defendant-intervenors.

Eaton, Judge:  This matter is before the court following a second remand to the United States Department of Commerce ("Commerce" or the "Department").  In *Hontex Enterprises, Inc. v. United States*, 28 CIT __, 342 F. Supp. 2d 1225 (2004) ("*Hontex II*"), this court remanded Commerce's findings contained in the *Final Results of Determination Pursuant to Court Remand* (Dep't Commerce Aug. 12, 2003) ("*First Remand Determination*") for further analysis and explanation.  Now before the court is Commerce's determination on remand.  *See Final Results of Determination Pursuant to Court Remand* (Dep't Commerce Oct. 18, 2004) ("*Second Remand Determination*").  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the reasons set forth below, this matter is again remanded to Commerce to take action in conformity with this opinion.


BACKGROUND

The facts of this case have been related in detail in previous opinions of this court.  *See Hontex Enters., Inc. v. United States*, 27 CIT __, __, 248 F. Supp. 1323, 1325–28 (2003) ("*Hontex I*"); *Hontex II*, 28 CIT at __, 342 F. Supp. 2d at 1226–28.  The facts relevant to this inquiry are as follows.

On October 29, 1998, Commerce initiated a review of the antidumping duty order covering crawfish tail meat from the People's Republic of China ("PRC").  *See Initiation of Antidumping and Countervailing Duty Admin. Review, Requests for Revocation in Part and Deferral of Admin. Review*, 63 Fed. Reg. 58,009 (ITA Oct. 29, 1998).  As part of that review, Ningbo Nanlian Frozen Foods Company ("NNL") and Huaiyin Foreign Trading Company (5) ("HFTC5") submitted questionnaire responses.  *See, e.g., Questionnaire Resp. of [NNL] and La. Packing Co.*, Pub. R. Doc. 19 (Dec. 8, 1998); *Questionnaire Resp. of [HFTC5]*, Pub. R. Doc. 24 (Dec. 22, 1998).  After reviewing the questionnaire responses, Commerce had questions concerning the relationship between NNL and HFTC5.  *See Letter from Commerce to law firm of Arent Fox Kintner Plotkin & Kahn of 1/12/00*, Pub. R. Doc. 141. These questions arose when it was found that a "Mr. Wei"—who was listed on NNL's business license as its Vice General Manager—had signed several HFTC5 documents and had represented himself to United States officials as being in charge of HFTC5's crawfish export business to the United States. *Id*.  NNL responded to these concerns by stating that, while Mr. Wei did work for both NNL and HFTC5 during the period of review, his work for NNL was not related to his work for HFTC5.  *See Letter from law firm of Arent Fox Kintner Plotkin & Kahn to Commerce of 1/31/00*, Conf. R. Doc.

21.

Commerce then informed NNL and HFTC5 that it would conduct verification of their questionnaire responses and noted that it would be exploring the relationship among Mr. Wei, NNL, and HFTC5. Commerce specifically asked that Mr. Wei be present at verification to answer questions. *See NNL Verification Outline*, Pub. R. Doc. 176 Attach. at 3. ("Please make certain that Mr. Wei is available for this portion of the verification."). At NNL's verification, various NNL officials, Mr. Edward Lee (part-owner of NNL), and Mr. Wei all answered questions about Mr. Wei's relationship with both NNL and HFTC5. *See Verification Report for [NNL] in the Antidumping Duty Review of Freshwater Crawfish Tail Meat (crawfish) from the PRC*, Pub. R. Doc. 188 at 5-10 ("*NNL Verification Memo*").

While NNL participated in verification, HFTC5 did not. *See Freshwater Crawfish Tail Meat (crawfish) from the PRC Admin. Review: Attempts to conduct verification at HFTC5*, Pub. R. Doc. 187. Thus, Commerce was unable to directly verify the information HFTC5 provided about Mr. Wei's relationship with that company. It is not in dispute, however, that Mr. Wei performed various tasks for HFTC5 during the period of review. *See*

*Supplemental Questionnaire Resp. of NNL and LA Packing Co.*, Pub. R. Doc. 169 Attach. at 2-6; *see also Freshwater Crawfish Tail Meat (crawfish) from the PRC Admin. Review: Meeting with U.S. Customs Service, American Embassy, Beijing PRC*, Pub. R. Doc. 191 ("*Customs Memo*").

After analysis of the questionnaire responses and the information collected at verification, Commerce determined that there was a "web of control relationships" between HFTC5 and NNL and so "collapsed" the companies and treated them as single entity. *See Relationship of [NNL] and [HFTC5]*, Pub. R. Doc. 218 at 9 ("*Relationship Memo*"). Because HFTC5 had not participated in verification, Commerce determined that it was to receive the PRC-wide antidumping duty rate. *Id.* Because NNL was to be "collapsed" with HFTC5, it received the PRC-wide rate as well. *Id.; see also Freshwater Crawfish Tail Meat From the PRC: Final Results of Admin. Antidumping Duty and New Shipper Reviews, and Final Rescission of New Shipper Review*, 65 Fed. Reg. 20,948, 20,949 (ITA Apr. 19, 2000) ("*Final Results*"). The PRC-wide antidumping duty rate was ultimately established to be 201.63%. *See Final Results*, 63 Fed. Reg. at 20,949.

Plaintiff[1] then commenced this action challenging various aspects of Commerce's determinations contained in the *Final Results*. *See generally Hontex I*. After review of the *Final Results* the court determined that: (1) while the methodology that Commerce used to determine whether NNL and HFTC5 should be collapsed was a proper interpretation of the antidumping statute as far as it went, a more complete analysis was needed, *see Hontex I,* 27 CIT at __, 248 F. Supp. 2d at 1343-44; and (2) substantial evidence did not support Commerce's determination that a "web of control relationships" existed between NNL and HFTC5 such that Commerce could "collapse" the companies and treat them as a single entity. *See id.* at __, 248 F. Supp. 2d at 1345. The court remanded the action to Commerce so that it could more fully explain its non-market economy ("NME") collapsing methodology and identify specific record evidence supporting its determination that NNL and HFTC5 should be collapsed.

On remand, Commerce revisited its collapsing methodology and again found that NNL and HFTC5 should be collapsed and treated as

---

[1]    As a domestic importer of the subject merchandise, Hontex is an "interested party" within the meaning of 19 U.S.C. § 1677(9)(A) (2000), and is entitled to challenge Commerce's determination pursuant to 19 U.S.C. § 1516a(a)(2) (2000). In addition to being a domestic importer of the subject merchandise, Hontex is also part-owner of NNL.

a single entity.  *See First Remand Determination* at 3.  Once again, Plaintiff questioned Commerce's determination and urged the court to reject the results of the *First Remand Determination*.

In *Hontex II* the court found that Commerce's NME-collapsing methodology was a reasonable interpretation of the antidumping statute.  *Hontex II*, 28 CIT at __, 342 F. Supp. 2d at 1234.  The court also found, however, that Commerce's determination that NNL and HFTC5 should be collapsed was not supported by substantial evidence and so again remanded the matter for further proceedings in accordance with that opinion.  *Id*. at __, 342 F. Supp. 2d at 1246.

Commerce published the results of its analysis of the second remand on October 18, 2004.  In the *Second Remand Determination* Commerce continued to find that NNL and HFTC5 should be collapsed because "[a]fter re-examining and weighing all of the record evidence, we continue to find that there was a significant potential for manipulation of prices and export decisions and, therefore, that HFTC5 and [NNL] should be collapsed and subject to the same antidumping duty rate."  *Second Remand Determination* at 1-2.  Plaintiff again contests Commerce's findings and, thus,

this matter is again before the court.


## STANDARD OF REVIEW

When reviewing a final determination in an antidumping or countervailing duty investigation, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a mere scintilla."  *Consol. Edison*, 305 U.S. at 229.  The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Huaiyin*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

DISCUSSION

I.   COMMERCE'S COLLAPSING METHODOLOGY

As previously noted, in *Hontex II* this court found
Commerce's NME collapsing methodology, as set out in the *Second
Remand Determination*, to be a reasonable interpretation of the
antidumping statute.  *See Hontex II*, 28 CIT at __, 342 F. Supp.
2d at 1234 ("Commerce has satisfied the court's remand
instructions by setting out its NME collapsing methodology.").
In essence, Commerce uses a methodology similar to the one it
uses for collapsing market economy companies.[2]  *See Hontex I*, 27
CIT at __, 248 F. Supp. 2d at 1338–40 (setting out Commerce's
market economy collapsing methodology); *see also* 19 U.S.C. §
1677(33),[3] 19 C.F.R. § 351.102(b)[4], .401(f)[5].  Using this

---

[2]     Commerce's market economy collapsing methodology, now
contained in its regulations, has been found to be a reasonable
interpretation of the antidumping statute.  *See* 19 C.F.R. §
351.401(f); *Koenig & Bauer-Albert AG v. United States*, 24 CIT
157, 160, 90 F. Supp. 2d 1284, 1287 (2000) (citing *Asociacion
Colombiana de Exportadores de Flores v. United States*, 22 CIT
173, 201, 6 F. Supp. 2d 865, 893 (1998); *Queen's Flowers de
Colom. v. United States*, 21 CIT 968, 971–72, 981 F. Supp. 617,
622–23 (1997)) ("Commerce's collapsing practice has been approved
by the court as a reasonable interpretation of the antidumping
statute.").

[3]     19 U.S.C. § 1677(33) provides, in relevant part:

The following persons shall be considered to be
"affiliated" or "affiliated persons": . . .

(F) Two or more persons directly or
indirectly controlling, controlled by, or

_____

under common control with, any person.

(G) Any person who controls any other person
and such other person.

For purposes of this paragraph, a person shall be
considered to control another person if the person is
legally or operationally in a position to exercise
restraint or direction over the other person.

[4]     19 C.F.R. § 351.102(b) provides:

"Affiliated persons" and "affiliated parties" have the
same meaning as in section 771(33) of the Act [19
U.S.C. § 1677(33)].  In determining whether control
over another person exists . . . the Secretary will
consider the following factors, among others: corporate
or family groupings; franchise or joint venture
agreements; debt financing; and close supplier
relationships.  The Secretary will not find that
control exists on the basis of these factors unless the
relationship has the potential to impact decisions
concerning the production, pricing, or cost of the
subject merchandise or foreign like product.  The
Secretary will consider the temporal aspect of a
relationship in determining whether control exists;
normally, temporary circumstances will not suffice as
evidence of control.

[5]     19 C.F.R. § 301.401(f) provides:

(1) In general. In an antidumping proceeding under this
part, the Secretary will treat two or more affiliated
producers as a single entity where those producers have
production facilities for similar or identical products
that would not require substantial retooling of either
facility in order to restructure manufacturing
priorities and the Secretary concludes that there is a
significant potential for the manipulation of price or
production.

(2) Significant potential for manipulation. In
identifying a significant potential for the
manipulation of price or production, the factors the

methodology Commerce must first determine whether two or more entities are "affiliated." Two or more entities are affiliated where they share various control relationships whereby one entity is "legally or operationally in a position to exercise restraint or direction over" the other and that such relationship provides one entity the "significant potential for the manipulation of price or production" of the other. *See Hontex I*, 27 CIT at __, 248 F. Supp. 2d at 1339 (citing 19 C.F.R. § 351.401(f), *Marine Harvest (Chile) S.A. v. United States*, 26 CIT 1295, 1298 n.8, 244 F. Supp. 2d 1364, 1368 n.8 (2002); *Certain Cut-To-Length Carbon-Quality Steel Plate Prods. From Indon.*, 64 Fed. Reg. 41,206, 41,209 (ITA July 29, 1999) (prelim. determination)). In addition to price and production decisions, in the case of NME entities, the "significant potential for . . . manipulation" extends to exporters and their export decisions. *Hontex II*, 28 CIT at __,

----

Secretary may consider include:

> (i) The level of common ownership;

> (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and

> (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

342 F. Supp. 2d at 1234.  In support of a determination that two companies are affiliated, Commerce must also consider the "temporal aspect" of the relationship as "normally, temporary circumstances will not suffice as evidence of control."  19 C.F.R. § 351.102(b); *see Hontex II*, 28 CIT at __, 342 F. Supp. 2d at 1233.  Once two entities are determined to be affiliated, and the significant potential for manipulation has been found, Commerce may then "collapse" them and give then a single antidumping duty margin.  *See* 19 C.F.R. § 351.401(f)(1); *Hontex II*, 28 CIT at __, 342 F. Supp. 2d at 1232–33 (quoting 19 C.F.R. § 351.401(f)(1)).

As the court has previously found the collapsing methodology used in this action to be a reasonable interpretation of the antidumping statue, and as Commerce has continued to use that methodology in the *Second Remand Determination*, the only question remaining is whether Commerce's conclusion that NNL and HFTC5 should be collapsed is supported by substantial evidence.

II.  COLLAPSING NNL AND HFTC5

   A.   *Commerce's Theory of Affiliation*

   In the *Second Remand Determination* it is not entirely clear what theory Commerce is relying on to support its finding that

NNL and HFTC5 are affiliated such that collapsing them into a single entity and giving them a single antidumping duty margin would be proper. At oral argument, however, counsel for Commerce clarified the Department's reasoning. Specifically, counsel stated that NNL and HFTC5 were affiliated because Mr. Lee had the potential to control the export and/or pricing decisions of both companies. According to Commerce's theory, Mr. Lee exercised control over NNL as its part-owner and over HFTC5 through Mr. Wei. As explained by counsel:

Court:     Did Mr. Lee control both companies?

Counsel:   Mr. Lee did not specifically control both companies. However, Mr. Wei Wei had the potential to control both companies and . . . Mr. Wei Wei is an agent of Mr. Lee. Therefore, if you follow the logic yes, Mr. Lee would have a potential to control both companies through Mr. Wei Wei.

Court:     Please tell me which one it is, if it's Mr. Lee in control, if it's HFTC5 in control. Tell me what the Commerce Department's theory is. . . . I understand that Mr. Wei Wei exercised control, but is it the Commerce Department's position that he was exercising control on his own behalf[?]

Counsel:   No, on Mr. Lee's behalf . . . .

Court:     So if you would just tell me what the theory is here.

Counsel:   Okay. Mr. Lee owns Louisiana Packing Company. He also owns [NNL]. Therefore he clearly controls both of those companies. His agent, Mr. Wei Wei, had the potential to control and make pricing decision on behalf

of HFTC5.  Therefore, if you follow the logic that Mr. Wei Wei is acting as Mr. Lee's agent, Mr. Lee has the potential to control pricing decisions for both companies.

Court:     For both companies?

Counsel:  Yes, Your Honor.

*Oral Argument Transcript of 3/30/2005* ("*Transcript*") at 33.

B.     *The Affiliation of NNL and HFTC5*

Following Commerce's collapsing methodology, it is first necessary to determine whether NNL and HFTC5 were affiliated through a control relationship.  As previously noted, Commerce stated that it was adhering to the statutory definitions of affiliation and control.  *See First Remand Determination* at 5–6 (quoting 19 U.S.C. § 1677(33)(F), (G)); *Relationship Memo* at 4 (quoting 19 U.S.C. § 1677(33)(F), (G)).  Thus, since it is Commerce's finding that NNL and HFTC5 were affiliated because Mr. Lee "controlled" them both, the court begins its analysis by reviewing whether the record supports such a finding.

1.     *Mr. Lee and Control of NNL*

As stated by counsel for Commerce at oral argument it is the Department's determination that Mr. Lee directly controlled NNL. *See Transcript* at 33:17–19.  In support of this finding Commerce points to several pieces of evidence, including that Mr. Lee was

the sole owner of Louisiana Packing which was, in turn, part-owner of NNL. *See First Remand Determination* at 22. Next, Commerce cites evidence that Mr. Wei, at Mr. Lee's direction, performed various tasks for NNL, including signing the joint venture documents that formed NNL and inspecting several shipments of crawfish tail meat. *Id.* In addition, Mr. Lee was present at, and an active participant in, NNL's verification. *Id.* at 22–23. The court agrees that Commerce's determination that Mr. Lee "controlled" NNL is supported by substantial. Indeed, there can be little doubt that Mr. Lee was able to directly control NNL's pricing and/or export decisions as part-owner of that company. *See*, *e.g.*, *Letter from Arent Fox Kintner Plotkin & Kahn to Commerce of 3/20/00*, Conf. R. Doc. 34, Ex. 3 ("I [(Mr. Lee)] informed the Department of Commerce verifiers that the prices negotiated for crawfish sales between [NNL] and Louisiana Packing Company were conducted solely by Mr. Lin Zhong Nan and myself on the telephone.").

### 2. *Mr. Lee and Control of HFTC5*

The court next examines whether Mr. Lee was able to control HFTC5. As stated by counsel for Commerce at oral argument, the Department's theory in this regard is that Mr. Lee indirectly

controlled HFTC5 through Mr. Wei.[6]  *See Transcript* at 33:19–23.
Counsel further explained the significance of Mr. Lee being able
to control HFTC5 and NNL by stating that "there was a potential
for price manipulation between [the] two companies and that
potential arises from . . . Mr. Wei . . . ."  *Id.* at 31:16–18.

While Commerce's theory of control hinges on Mr. Lee's
relationship with Mr. Wei, what is missing from Commerce's

---

[6]      [[

]]

analysis is any evidence tending to suggest that Mr. Lee was "legally or operationally in a position to exercise restraint or direction" over Mr. Wei's activities at HFTC5. First, absent from this analysis are any of the normal indicia of affiliation between Mr. Lee and HFTC5 set out in the regulations. *See* 19 C.F.R. § 351.102(b). That is, there is no suggestion that Mr. Lee or his family members or his companies have any ownership interest in HFTC5. Rather, Commerce's analysis relies entirely on the relationship between Mr. Lee and Mr. Wei. This analysis, though, falls short. An examination of the record reveals that there is neither: (1) evidence of Mr. Lee ever actually exercising control over Mr. Wei at HFTC5; nor (2) any evidence of Mr. Lee's potential to control Mr. Wei's activities at that company. Indeed, while Commerce provides great detail as to Mr. Wei's activities on behalf of HFTC5, none of this evidence links Mr. Lee to Mr. Wei's activities at that company. *See, e.g., NNL Verification Memo*, Pub. R. Doc. 188 at 5-7 (detailing questions posed to Mr. Wei about his relationship with HFTC5); *see also Customs Memo,* Pub. R. Doc. 191 (detailing Mr. Wei's contacts with the United States Customs Service). The only evidence on the record of anyone having control over Mr. Wei's activities at HFTC5 is that he took his orders from a person identified as

HFTC5's "general manager."[7]  *See*, *e.g.*, *Letter from law firm of Arent Fox Kintner Plotkin & Kahn to Commerce of 1/31/00*, Pub. R. Doc. 146 at 5 ("[A]ll actions undertaken by Mr. Wei with respect to HFTC (5) in 1998 were done with explicit instructions from the General Manager of HFTC (5).  He did not take, and had no authority to take, any unilateral or independent actions with regard to HFTC (5) . . . ."); *NNL Verification Memo*, Pub. R. Doc. 188 at 5 ("Mr. Wei explained that the general manager of HFTC5 would sometimes contact him for assistance because he was familiar with the crawfish business, spoke English, and had contacts with many of HFTC5's U.S. customers.  Upon HFTC5's request, Mr. Wei would contact U.S. customers on HFTC5's behalf by writing letters and faxes and by making phone calls." (citation omitted)); *id*. at 6 ("[A]t the request of the general manager of HFTC5, Mr. Wei contacted U.S. Customs to seek its assistance."); *id*. at 6-7 ("Mr. Wei stated that the General Manager [of] HFTC5 believed the 91.5% duty rate was HFTC5's alone and that using [Mr. Wei's] stamp would help Customs identify genuine HFTC5 shipments.  Mr. Wei stated that HFTC5's general

---

[7]     The court notes that this is not a new observation.  In *Hontex I* the court found that "the evidence shows that Mr. Wei's actions on behalf of [NNL and HFTC5] were performed at the direction of some other person-for HFTC5 it was the 'General Manager[]' . . . ."  *Hontex I*, 27 CIT at__, 248 F. Supp. 2d at 1346.

manager asked him to obtain the stamp . . . .").  Indeed,
counsel's comments at oral argument highlight the flaw in
Commerce's reasoning: there is simply no evidence on the record
of this antidumping review that Mr. Wei was acting as Mr. Lee's
"agent" at HFTC5.  While there is amble evidence that Mr. Lee was
acquainted with Mr. Wei and that Mr. Wei was working as Mr. Lee's
"agent" at NNL, this evidence does not support a further
inference that Mr. Wei was working as Mr. Lee's "agent" at HFTC5.
Therefore, substantial evidence does not support the conclusion
that Mr. Lee "controlled" HFTC5.[8]

CONCLUSION

Because the court finds that Commerce's determination that
Mr. Lee was in a position to "control" HFTC5 is not supported by
substantial evidence, the court cannot find that Commerce's
determination that NNL and HFTC5 should be collapsed is
justified.  Therefore, this matter is again remanded to Commerce
to either: (1)(a) find that Mr. Lee did not control HFTC5 within
the meaning of 19 U.S.C. § 1677(33)(F) & (G), and (b) find that
NNL and HFTC5 were not affiliated, and (c) find that NNL and

---

[8]     As the court does not find that substantial evidence
supports Commerce's conclusion that Mr. Lee controlled HFTC5 the
court need not, at this time, address Commerce's determination
with respect to the "temporal" aspect of Mr. Lee's control of
HFTC5.  *See Hontex II*, 28 CIT at __, 342 F. Supp. 2d at 1233.

HFTC5 should not be collapsed and given a single antidumping margin, and (d) find that NNL is entitled to a separate company-specific antidumping margin and calculate that margin using the verified information on the record; or (2)(a) re-open the record in order to gather additional evidence of Mr. Lee's control relationship with HFTC5 during the period of review, and (b) place such additional information on the record, and (c) conduct an analysis that takes into account any such new evidence, including the temporal aspect of any such new evidence.  The results of Commerce's review are due on November 29, 2005, comments are due on December 29, 2005, and replies to such comments are due on January 9, 2006.

_____
                              Richard K. Eaton

Dated:    August 31, 2005
          New York, New York