Slip Op. 06-137

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                              :
JINFU TRADING CO., LTD.,       :
                              :
              Plaintiff,       :  Before: Richard K. Eaton, Judge
                              :
                              :
       v.                      :
                              :  Court No. 04-00597
                              :  Public Version
UNITED STATES,                 :
                              :
              Defendant.       :
_____:
```

OPINION AND ORDER

[United States Department of Commerce's final results rescinding plaintiff's new shipper review remanded]

Dated: September 7, 2006


*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Bruce M. Mitchell* and *Adam M. Dambrov*), for plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Jeanne E. Davidson*, Deputy Director, International Trade Section, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David S. Silverbrand*), for defendant.


Eaton, Judge:  This matter[1] is before the court on plaintiff Jinfu Trading Co., Ltd.'s ("plaintiff" or "Jinfu PRC") Rule 56.2 motion for judgment upon the agency record challenging the

---

[1]  The Sioux Honey Association and the American Honey Producers Association were granted leave to intervene as of right in this action.  *See* Order of 1/4/05.

findings in the United States Department of Commerce's

("Commerce" or "the Department") final results and final

rescission of plaintiff's new shipper review ("NSR") for entries

of honey from the People's Republic of China ("PRC" or "China").

*See* Honey From the PRC, 69 Fed. Reg. 64,029 (ITA Nov. 3, 2004)

(final results) ("Final Results").  By its motion, plaintiff

contests the Department's conclusion that neither Yousheng

Trading (U.S.A.) Co., Ltd. ("Yousheng USA")[2] nor its successor

Jinfu Trading (U.S.A.) Co., Ltd. ("Jinfu USA") were affiliated

with Jinfu PRC within the meaning of 19 U.S.C. § 1677(33)(F) or

(G) (2000) on November 2, 2002, the date of the sale claimed as

the basis for the NSR.[3]  Commerce insists that because the record

does not support the conclusion that on November 2, 2002,

plaintiff's CEO owned or controlled either Yousheng USA or Jinfu

USA, Jinfu PRC's sale of honey to Yousheng USA constituted the

---

[2]     While plaintiff's motion and the Final Results address
the affiliation between Jinfu PRC and Jinfu USA, the record does
not contain any evidence that a company named Jinfu USA existed
as of November 2, 2002, the date of the claimed new shipper sale.
What the record does indicate, however, is that Yousheng USA, the
predecessor to Jinfu USA, did exist on November 2, 2002, and
indeed was the entity involved in the subject sale.  Therefore,
the court's review will refer to the alleged affiliated company,
where appropriate, as Yousheng USA.

[3]     The statute provides, in pertinent part, that the
following persons are deemed "affiliated": "(F) Two or more
persons directly or indirectly controlling, controlled by, or
under common control with, any person"; "(G) Any person who
controls any other person and such other person."  19 U.S.C. §
1677(33).

first sale of the merchandise to an unaffiliated U.S. customer.

As a result, Commerce found that the information contained in

plaintiff's request for a new shipper review was incomplete.  *See*

Final Results, 69 Fed. Reg. at 64,029-30.  Thus, Commerce

maintains that it was justified in rescinding the new shipper

proceedings.  Jurisdiction lies with 28 U.S.C. § 1581(c) (2000)

and 19 U.S.C. § 1516a(a)(2)(B)(iii).  For the following reasons,

the Department's Final Results are remanded.


BACKGROUND

Plaintiff is an exporter of honey from the PRC.  *See* Br.

Supp. Pl.'s R. 56.2 Mot. J. Ag. R. ("Pl.'s Br.") at 7; *see also*

Def.'s Opp'n Pl.'s Mot. J. Ag. R. ("Def.'s Opp'n") at 3.  Its

alleged affiliate, Yousheng USA (whose name was later changed to

Jinfu Trading (U.S.A.) Co., Ltd.)[4] is a domestic corporation,

formed by Mr. A[5] in October of 2002 to import baby strollers from

the PRC.  *See* Def.'s Opp'n at 4.  Because the standards imposed

---

[4]      On November 8, 2002, Yousheng USA filed an amendment
with the State of Washington to change its name to Jinfu Trading
(U.S.A.) Co., Ltd.  *See* Def.'s Opp'n at 4.

[5]      For purposes of confidentiality, [[               ]],
the resident officer of Jinfu USA, the successor to Yousheng USA,
will be referred to as "Mr. A".  It is unclear who actually owned
Yousheng USA when it was formed, Mr. A or [[               ]],
who will be referred to as "Mr. D".  Mr. A incorporated Yousheng
USA, but Mr. D was listed as the sole shareholder on the
instrument purporting to transfer ownership of the company.  *See*
Pl.'s Conf. App. 10; *see also* Pl.'s Br. 10.

on entries of baby strollers made their importation difficult, the plan was abandoned.  *See* Pl.'s Br. at 9.  As a result, Mr. A was left to find another use for the company.  Coincidentally, Jinfu PRC's chairman and CEO, CEO B,[6] was seeking to establish a U.S. company to import honey from the PRC.  *See id*. at 10. Having learned of CEO B's intentions, Mr. A suggested that CEO B use Yousheng USA to import his merchandise.  *See id*.  Thereafter, certain activities took place with the apparent purpose of: (1) transferring ownership of Yousheng USA to CEO B; and (2) changing the corporate name of Yousheng USA to Jinfu Trading (U.S.A.) Co., Ltd. ("Jinfu USA").  *See* Pl.'s Conf. App. 10.

On June 30, 2003, in accordance with 19 U.S.C. § 1675(a)(2)(B),[7] plaintiff filed a request with Commerce that it

---

[6]     For purposes of confidentiality, [[                 ]], the chairman and CEO of Jinfu PRC, will be referred to as "CEO B".  Neither party disputes that as chairman and CEO, CEO B controlled Jinfu PRC.

[7]     Pursuant to the statute:

> If the administering authority receives a request from an exporter or producer of the subject merchandise establishing that—
>
>> (I) such exporter or producer did not export the merchandise that was the subject of an antidumping duty . . . order to the United States . . . during the period of investigation, and

(continued...)

initiate an NSR for the period beginning on December 1, 2002 and

ending May 31, 2003.[8]  *See* Pl.'s Br. at 7.  As part of the

request, plaintiff made the certifications and supplied the

documentation required by 19 C.F.R. § 351.214(b) (2005).[9]  *See*

_____

[7](...continued)
>           (II) such exporter or producer is
>           not affiliated (within the meaning
>           of section 1677(33) of this title)
>           with any exporter or producer who
>           exported the merchandise to the
>           United States . . . during that
>           period,
>
>     the administering authority shall conduct a
>     review under this subsection to establish an
>     individual weighted average dumping margin
>     . . . .

19 U.S.C. § 1675(a)(2)(B).

[8]     This Court has described a "new shipper review" as a proceeding where "Commerce is essentially conducting a new antidumping review that is specific to a particular producer [or exporter]." *Tianjin Tiancheng Pharm. Co., Ltd. v. United States*, 29 CIT __, __, 366 F. Supp. 2d 1246, 1249 (2005).

[9]     The regulation states, in pertinent part, that a request for a new shipper review must contain the following:

>     (ii)(A)  The certification [that the person requesting
>              the review did not export subject merchandise
>              to the United States during the period of
>              investigation]; and
>
>         (B)  A certification from the person that
>              produced or supplied the subject
>              merchandise to the person requesting the
>              review that that producer or supplier
>              did not export the subject merchandise
>              to the United States . . . during the
>              period of investigation;

(continued...)

Pl.'s Br. at 7.  Among other things, plaintiff certified that on

November 2, 2002, it sold honey to what it stated was its

American affiliate, Jinfu USA.[10]  Plaintiff further provided

_____

[9](...continued)
(iii)(A)   A certification that, since the investigation
           was initiated, such exporter or producer has
           never been affiliated with any exporter or
           producer who exported the subject merchandise
           to the United States . . . during the period
           of investigation, including those not
           individually examined during the
           investigation;

     (B)   In an antidumping proceeding involving
           imports from a nonmarket economy
           country, a certification that the export
           activities of such exporter or producer
           are not controlled by the central
           government;

  (iv) Documentation establishing:

     (A)   The date on which subject merchandise of
           the exporter or producer making the
           request was first entered, or withdrawn
           from warehouse, for consumption, or, if
           the exporter or producer cannot
           establish the date of first entry, the
           date on which the exporter or producer
           first shipped the subject merchandise
           for export to the United States;

     (B)   The volume of that and subsequent
           shipments; and

     (C)   The date of the first sale to an
           unaffiliated customer in the United
           States . . . .

19 C.F.R. § 351.214(b)(2)(ii)-(iv).

     [10]   Although Yousheng USA did not file the necessary
documents to have its name changed to "Jinfu USA" until November
                                              (continued...)

instruments documenting that on December 17, 2002, its affiliate

resold the honey purchased from Jinfu PRC to an unaffiliated U.S.

customer, Customer C.[11]  *See* Pl.'s Conf. App. 1 at Ex. 3.  Jinfu

PRC claimed that this sale constituted "[t]he date of the first

sale to an unaffiliated customer in the United States."  19

C.F.R. § 351.214(b)(iv)(C); *see also* Pl.'s Conf. App. 1 at 3

("Exhibit 3 . . . contains a copy of the commercial invoice for

the first sale to an unaffiliated customer in the United States,

which shows the date of this first sale to an unaffiliated

customer.") (emphasis omitted).  Based on plaintiff's

certifications, the Department granted plaintiff's request and

initiated the NSR for the period beginning on December 1, 2002

and ending May 31, 2003.  *See* Honey From the PRC, 68 Fed. Reg.

47,537 (ITA Aug. 11, 2003).


Commerce then issued its antidumping questionnaire, to which

plaintiff responded on September 16, 2003.  *See* Pl.'s Br. at 8;

*see also* Pl.'s Conf. App. 4.  In its response, plaintiff stated

that a company called Jinfu USA was its affiliate because CEO B

owned that company.  *See* Pl.'s Br. at 8.  Plaintiff's response

---

[10](...continued)
8, 2002, "Jinfu USA" was listed on the invoice as the purchaser
of the honey from Jinfu PRC.  *See* Pl.'s Conf. App. 1, Ex. 3.

[11]    For purposes of confidentiality, [[                  ]],
the "unaffiliated U.S. customer," will be referred to as
"Customer C."

further included an invoice as evidence that November 2, 2002 was the date of the first sale between Jinfu PRC and Jinfu USA. *See* Def.'s Opp'n at 4. However, the response also contained evidence indicating that ownership of Yousheng USA, the predecessor of Jinfu USA, did not pass to CEO B until October 25, 2003, nearly one year after the date of the claimed affiliated sale. *See id*.

This discrepancy between the date of the claimed affiliated sale of the honey and the transfer of company ownership caused the Department to conclude that more information relating to the issue of affiliation was needed; thus, it issued a supplemental questionnaire. *See* Pl.'s Br. at 9; *see also* Def.'s Opp'n at 4. In its supplemental response, plaintiff stated that: (1) Jinfu USA was legally incorporated in the State of Washington on October 4, 2002; (2) that Yousheng USA's name was lawfully changed to Jinfu USA on November 12, 2002; (3) that the October 25, 2003 execution date contained on the certificate purporting to transfer 10,000 shares of Yousheng USA to CEO B was a clerical error and the date should have been October 25, 2002; and (4) that ownership of Yousheng USA passed to CEO B by the transfer of 10,000 shares of Yousheng USA stock. *See* Def.'s Opp'n at 4.[12]

_____

[12] Plaintiff submitted several corporate documents to support the affiliation claim articulated in its supplemental response. First, plaintiff relied on the November 12, 2002 "Certificate of Existence/Authorization" as support for its claim

(continued...)

The Department then carried out verification of Jinfu PRC's questionnaire responses at both its China and U.S. facilities. *See* Pl.'s Br. at 12.  At the China site, Commerce interviewed Jinfu PRC officials and reviewed corporate documents, while in the United States, the Department spoke with Mr. A about the relationship between Yousheng USA and Jinfu PRC.  *See* Pl.'s Br. at 12–13; *see also* Def.'s Opp'n at 5.

Upon reviewing the data contained in plaintiff's questionnaire responses, Commerce published its preliminary results rescinding Jinfu PRC's NSR.  *See* Honey From the PRC, 69 Fed. Reg. 31,348, 31,349 (preliminary results) (ITA June 3, 2004) ("Preliminary Results").  In the Preliminary Results, Commerce found that Jinfu USA was not affiliated with Jinfu PRC on November 2, 2002.  As a result, Commerce deemed plaintiff's request for an NSR incomplete because it did not properly describe the first unaffiliated sale of the merchandise.  This

---

[12](...continued)
that Jinfu USA existed as of October 4, 2002.  Next, plaintiff pointed to the "Certificate of Transfer of Shares" that purported to transfer 10,000 shares of either Yousheng USA or Jinfu USA to CEO B on October 25, 2002.  Then, plaintiff referenced Jinfu USA's November 18, 2002 "Master Application" for a business license, which it claimed demonstrated that the two companies were affiliated.  Plaintiff further contended that the March 24, 2003 "Amended Articles of Incorporation" for Jinfu USA specifically stated that CEO B was the sole owner of Jinfu USA. Finally, plaintiff argued that Jinfu USA's 2002 tax return, dated June 13, 2003, indicated that Jinfu USA was wholly owned by CEO B.  *See generally* Pl.'s Conf. App. 10, 11.

conclusion was based primarily on the Department's finding that no company named Jinfu USA existed until November 12, 2002, thereby rendering impossible any claim that plaintiff was affiliated with that company on November 2, 2002. *See* Def.'s Opp'n at 6. In addition, Commerce found that the October 25, 2003 date on the Certificate of Transfer of Shares precluded a finding that CEO B owned either Yousheng USA or Jinfu USA on November 2, 2002. *See id*. The reasons behind Commerce's conclusions were expanded upon in a memorandum that was released to Jinfu PRC approximately one week prior to the publication of the Preliminary Results. *See generally* Honey From the PRC: Analysis of the Relationship and Treatment of Sale between Jinfu Trading Co., Ltd., and Jinfu Trading (USA), Inc. (ITA May 26, 2004).

Following the publication of the Preliminary Results, Commerce notified plaintiff that it would accept comments regarding its findings.[13] *See* Def.'s Opp'n at 7. Jinfu PRC took advantage of this opportunity by submitting a case brief claiming: (1) that Jinfu USA was an existing corporate entity in

---

[13] In addition to its substantive challenges, plaintiff seeks a remand of the Final Results because, in its view, Commerce failed to afford it an adequate opportunity to explain the inconsistencies that provided the basis for the Preliminary Results. *See* Pl.'s Br. at 31-38. Because of the court's remand instructions, it is unnecessary to now decide plaintiff's ancillary claim.

the State of Washington on November 2, 2002; and (2) that the date of the Certificate of Transfer of Shares was a clerical error and that the actual date ownership of Yousheng USA transferred to CEO B was October 25, 2002.  *See* Pl.'s Case Brief in Honey from the PRC: NSR for 12/10/02–5/31/03-(Inv. No. A-570-863) (July 7, 2004) at 6.  Ultimately, Commerce affirmed in the Final Results its preliminary finding that the two companies were not affiliated and, thus, rescinded plaintiff's NSR.  *See* Final Results, 69 Fed. Reg. at 64,029–30.  Plaintiff challenges the Final Results.

## STANDARD OF REVIEW

When reviewing a final new shipper review determination by Commerce, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(I); *see also Hebei New Donghua Amino Acid Co., Ltd. v. United States*, 29 CIT __, __, 374 F. Supp. 2d 1333, 1337 (2005).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The existence of substantial evidence is determined "by considering

the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Id.* (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  In addition, "'a reviewing court is not barred from setting aside a[n] [agency] decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view.'" *Nippon Steel Corp. v. United States*, __ F.3d __, __ (Fed. Cir. 2006) (internal quotation marks and citation omitted); *see also id.* ("It will be the duty of the courts to determine in the final analysis and in the exercise of their independent judgment, whether on the whole record the evidence in a given instance is sufficiently substantial to support a finding, conclusion, or other agency action as a matter of law.").  Finally, the possibility of drawing two opposite, yet equally justified conclusions from the record will not prevent the agency's determination from being supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).


                              DISCUSSION

 I.  Affiliation Between Jinfu PRC and Yousheng USA

     A.   Relevant Law

     In its affiliation analysis, Commerce must examine the

subject relationship in accordance with 19 U.S.C. § 1677(33).[14]

This section contains two subsections that provide general

descriptions of affiliated persons.  *See* 19 U.S.C. §§

1677(33)(F), (G).  The first general provision, § 1677(33)(F),

---

[14]     According to the statute:

The following persons shall be considered
"affiliated" or "affiliated persons":

(A) Members of a family, including
brothers and sisters (whether by
the whole or half blood), spouse,
ancestors, and lineal descendants.

(B) Any officer or director of an
organization and such organization.

(C) Partners.

(D) Employer and employee.

(E) Any person directly or
indirectly owning, controlling, or
holding with power to vote, 5
percent or more of the outstanding
voting stock or shares of any such
organization and such organization.

(F) Two or more persons directly or
indirectly controlling, controlled
by, or under common control with,
any person.

(G) Any person who controls any
other person and such other person.

For purposes of this paragraph, a person
shall be considered to control another person
if the person is legally or operationally in
a position to exercise restraint or direction
over the other person.

19 U.S.C. § 1677(33).

states that "[t]wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person," are affiliated.  19 U.S.C. § 1677(33)(F).  Similarly, § 1677(33)(G) instructs that affiliation is had between "[a]ny person who controls any other person and such other person."  19 U.S.C. § 1677(33)(G).  At the conclusion of § 1677(33), Congress inserted an additional paragraph stating even more particularly that, "[f]or purposes of [§ 1677(33)], a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."  19 U.S.C. § 1677(33).  Thus, these provisions of the statute direct Commerce to center its affiliation analysis on the question of control, i.e., whether one party is in a position to "exercise restraint or direction" over another.

Commerce is also guided by the regulations to § 1677(33), which provide:

> In determining whether control over another person exists, within the meaning of [19 U.S.C. § 1677(33)], the Secretary will consider the following factors, among others: corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships.  The Secretary will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product. The Secretary will consider the temporal aspect of a relationship in determining whether control exists;

> normally, temporary circumstances will not suffice as
> evidence of control.

19 C.F.R. § 351.102(b).


This Court has interpreted the statutory and regulatory language as requiring Commerce to find affiliation where the party alleging affiliation has demonstrated that "[t]wo or more entities . . . share various control relationships whereby one entity is legally or operationally in a position to exercise restraint or direction over the other and that such relationship provides one entity the significant potential for the manipulation of price or production of the other." *Hontex Enters., Inc. v. United States*, 29 CIT __, __, 387 F. Supp. 2d 1353, 1358 (2005) (internal quotation marks omitted). In addition, this Court has further held that a finding of control does not require a showing of actual control, but rather proof that one party has the potential to exercise control over the other is sufficient. *See China Steel Corp. v. United States*, 28 CIT __, __, 306 F. Supp. 2d 1291, 1299 (2004) ("'The [affiliation] statute focuses on the capacity to control, rather than on the actual exercise of control.'") (quoting *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 23 CIT 804, 813 (1999) (not reported in the Federal Supplement)).

Therefore, the court must determine whether Commerce reasonably concluded that the evidence failed to demonstrate that on November 2, 2002, CEO B had, at a minimum, the potential to exercise control over the pricing decisions of Yousheng USA.

B.     Evidence of Affiliation: Ownership Interest

Jinfu PRC initially claims that because CEO B was the owner of Jinfu USA, the entities were affiliated on November 2, 2002. Plaintiff raises several arguments to demonstrate that Commerce failed to consider the "compelling" record evidence supporting this claim.  *See* Pl.'s Br. at 20.  Its arguments relate principally to the Department's conclusion that plaintiff's proffered evidence failed to support its assertions that Jinfu USA existed on November 2, 2002, and that CEO B owned or controlled the company on that date.  *See id*.

Plaintiff's primary contention in response to Commerce's determination that Jinfu USA did not exist on November 2, 2002, is that Commerce erred by not giving due credit to the Certificate of Existence/Authorization ("Certificate of Existence") issued to Jinfu USA by the State of Washington.  *See id*. at 20-21.  As plaintiff states, "on November 12, 2002, the State of Washington issued a [Certificate of Existence] to a company named 'Jinfu Trading (USA) Inc.' expressly stating that

the original 'Certificate of Incorporation' was issued to this company by the State of Washington on October 4, 2002." *Id*. Plaintiff understands this document to indicate that, as of October 4, 2002, Jinfu USA existed as a corporate entity. *See id.* Thus, plaintiff argues that had Commerce accorded an appropriate level of credit to this document, it would have been compelled to conclude that Jinfu USA existed at the time of the first sale.

Plaintiff next contends that the Department erred in finding that CEO B did not have any ownership interest in either Yousheng USA or Jinfu USA at the time of the claimed new shipper sale because the Certificate of Transfer of Shares was dated October 25, 2003, almost one year after the date of the new shipper sale. *See* Pl.'s Br. at 23. Plaintiff bases it argument on its understanding of the law of contracts, which it contends does not require an agreement to be either reduced to writing or signed in order to become effective. *See id*. ("The contract needn't be in writing; if it is in writing, it needn't be signed, provided there's other evidence of acceptance, for example . . . by performance.") (internal citation and quotation marks omitted). In addition to relying on general contract principles, plaintiff analogizes its situation to that presented in Washington State securities law, which plaintiff states "expressly provides that a

signed, written contract is not required to enforce an agreement to sell securities." *Id*. at 24 (citing Wash. Rev. Code § 62A.8-113). In other words, plaintiff claims that regardless of the date on the Certificate of Transfer of Shares, actual ownership of Yousheng USA transferred to CEO B on October 25, 2002.

As additional support for its claim that CEO B owned Jinfu USA on November 2, 2002, plaintiff points to several corporate documents including the November 18, 2002 Master Application for Jinfu USA's business license, Jinfu USA's March 24, 2003 Amended Articles of Incorporation, and Jinfu USA's 2002 tax return, dated June 13, 2003. *See generally id*. at 20. According to plaintiff, although these documents are dated after the date of the claimed new shipper sale, each one indicates that CEO B was the sole owner of Jinfu USA on November 2, 2002. *See*, *e.g.*, *id*. at 21 ("[b]oth the original and amended tax returns expressly stated that [CEO B] was the 100 percent owner of Jinfu-USA.").

Next, plaintiff argues that Commerce failed to consider the data gathered at verification from CEO B and Mr. A. In plaintiff's view, the information adduced through Commerce's interviews of both CEO B and Mr. A established that the formation date of Jinfu USA was October 4, 2002, and that CEO B owned that company on the date of the claimed new shipper sale. *Id*. Put

another way, plaintiff contends that the data marshaled through verification were not only credible, but also failed to provide the Department with "any evidence, let alone substantial evidence, that Jinfu-USA was owned by any person other than [CEO B]."  *Id.*

Commerce takes issue with plaintiff's argument that the State of Washington documents remove all doubt as to when Jinfu USA existed as a corporate entity.  *See* Def.'s Opp'n at 17.  The Department further asserts that plaintiff's proffered documents fail to establish that CEO B owned either Yousheng USA or Jinfu USA, and, thus, do not support a finding that Jinfu PRC and the U.S. company were affiliated as of November 2, 2002.  *See id.* According to Commerce:

> [T]he documents upon which [plaintiff] relies are all dated after November 2, 2002, the date of the subject sale and, therefore, do not demonstrate control on November 2.
>
> Additionally, in the "Master Application" filed with the state of Washington on November 18, 2002, sixteen days after the new shipper sale, which lists all owners, neither Jinfu PRC nor its CEO are purported to be owners, but rather the only name present is an employee of Jinfu USA's predecessor company, Yousheng USA.  Furthermore, although the "Master Application" requested notification of any change of ownership, no change was indicated upon the record.  Further still, the portion of the form stating whether Jinfu USA, "is owned by, controlled by, or affiliated with any other business entity," is blank.

*Id.*

Moreover, the Department states that:

> [R]ecord evidence from the State of Washington and the
> "Amended Articles of Incorporation" prepared by
> Yousheng USA's/Jinfu USA's U.S. attorney, contradict
> the information submitted and statements by Jinfu PRC
> concerning the date on which the transfer of ownership
> took place.  First, none of the documents filed with
> the State of Washington state that the CEO of Jinfu PRC
> is the owner of Yousheng USA or Jinfu USA or that
> either Yousheng USA or Jinfu USA changed ownership.
> .  .  .   [T]he record lacks evidence demonstrating that
> Jinfu USA informed the State of Washington of any
> alleged change in ownership as late as November 8,
> 2002.  Furthermore, Jinfu USA's "Amended Articles of
> Incorporation" were signed well after January 2003,
> further calling into question the alleged date of
> transfer of ownership, and it is unclear from the
> record whether this document was in fact filed by Jinfu
> USA with the State of Washington.  Lastly, Jinfu USA's
> application for a "Master Business License," examined
> by the Department at its Jinfu CEP Verification,
> contradicts Jinfu PRC's assertion that its CEO owned
> Jinfu USA on October 25, 2002. .  .  .

Issues and Decision Memorandum for the Final Results and Final
Rescission, In Part, of the New Shipper Review of the Antidumping
Duty Order on Honey from the PRC (ITA Oct. 25, 2004) ("Issues &
Decision Mem.") at 11.  In other words, Commerce maintains that
plaintiff's evidence that a company named Jinfu USA existed on
November 2, 2002 and that CEO B owned that company, is not
probative of the facts plaintiff wishes to establish.

Commerce further observes that the Certificate of Transfer
of Shares, which memorialized the transfer of ownership of
Yousheng USA to CEO B, did not become legally effective until
signed.  *See id*. at 10.  Although bearing the date October 25,

2003, Commerce notes that the document was not signed until December 30, 2003, more than one year after the date of the claimed new shipper sale.  In an effort to explain this discrepancy, plaintiff submitted the affidavit of CEO B, in which he claimed that in December 2003, he recognized that he had not signed the transfer, and so he signed it and backdated it October 25, 2003.  *See* Def.'s Opp'n at 18.  For Commerce, the admission by CEO B that he backdated the document renders unreliable plaintiff's claim that it was not dated October 25, 2002 because of a clerical error.

Commerce finds additional fault with the Certificate of Transfer of Shares, which purported to transfer complete ownership of Yousheng USA to Jinfu PRC through the transfer of 10,000 shares of stock.  According to Commerce, the March 24, 2003 Amended Articles of Incorporation for Jinfu USA, however, state that there were 500,000 shares of the company outstanding as of that date.  *See* Def.'s Opp'n at 18.  Thus, the Department asserts that a controlling interest in the company could not have been achieved by the transfer of only 10,000 shares of stock. *See id*. at 17; *see also* Issues & Decision Mem. at 24 ("[T]he amount of shares allegedly transferred to the CEO of Jinfu PRC on October 25, 2002 is different from the amount of shares listed in Jinfu USA's 'Amended Articles of Incorporation' dated March 24,

2003.").

It is apparent that Commerce was not unreasonable in concluding that a company named Jinfu USA did not exist on November 2, 2002, and that CEO B did not own Jinfu USA or its predecessor Yousheng USA on that date.  First, while Mr. A formally applied to change Yousheng USA's name to Jinfu Trading (U.S.A.) Co., Ltd., he did not do so until November 8, 2002. Second, the November 12, 2002 Certificate of Existence, the document that recognized Yousheng USA's name change, indicates that Mr. A incorporated Yousheng USA, not Jinfu USA, on October 4, 2002.  As of that date, the company was owned by either Mr. A or Mr. D,[15]  not CEO B.  Third, all of the evidence relied upon by plaintiff to show ownership by CEO B is both equivocal and dated after November 2, 2002.  That is, the Certificate of Existence indicating that Yousheng USA had been renamed Jinfu USA is dated November 12, 2002; the Master Application for Jinfu USA's business license is dated November 18, 2002; the Certificate of Transfer of Shares was signed on December 30, 2003, but backdated to October 25, 2003; the Amended Articles of Incorporation are dated March 24, 2003; and Jinfu USA's 2002 tax

_____

[15]     Mr. D, the general manager of [[                    ]], assumed the [[        ]] fee Mr. A incurred as a result of incorporating Yousheng USA.  *See* Pl.'s Br. at 9, 13; *see also* Pl.'s Conf. App. 7, 10.

return is dated June 13, 2003.  Thus, the court cannot agree with plaintiff that these documents, all dated after November 2, 2002, support its claim that CEO B owned either Yousheng USA or Jinfu USA on that date.

Further, the court finds unavailing plaintiff's argument that the Certificate of Transfer of Shares did not require the parties' signatures in order to become effective.  By its terms, the document provides that: "THIS CERTIFICATE TRANSFER IS EFFECTIVE UPON EXECUTION BY THE UNDERSIGNED."  Pl.'s Conf. App. 7.  It is clear, therefore, that the Certificate of Transfer of Shares was not to gain legal effect unless and until the parties signed it.  Even if this document were found to be effective as of October 25, 2003, an unlikely conclusion given that it was actually signed and backdated by CEO B on December 30, 2003, it would still have been effective eleven months after November 2, 2002.  Further undermining plaintiff's argument that the law of contracts gives effect to the Certificate of Transfer of Shares on October 25, 2002 although neither party had signed the document as of that date, is CEO B's failure to pay Mr. D the consideration for the shares until more than one year after the date of the claimed new shipper sale.[16]  In other words, because

---

[16]     According to the verification report, CEO B paid the
[[          ]] debt incurred by [Mr. A] on [[                    ]]
                                                (continued...)

the transfer was not supported by valid consideration until well after November 2, 2002, plaintiff cannot rely on an unwritten contract as support for its claim of ownership.

It is likewise apparent that the substance of plaintiff's other evidence is equally lacking with respect to CEO B's claim of ownership in Jinfu USA. For instance, the portion of the Master Application in which it was asked if Yousheng USA was owned, controlled, or affiliated with another entity was left blank, thereby providing evidence that as late as November 12, 2002, Yousheng USA was still owned by Mr. D. *See* Pl.'s Conf. App. 10, Ex. 1 at 3(h) ("If this business is owned by, controlled by, or affiliated with any other business entity, please indicate that business entity's name . . . [no company reported] . . . ."). Finally, the court finds plaintiff's assertion regarding Jinfu USA's 2002 tax return to be without merit. The tax return was dated June 13, 2003. In addition, the tax return is not signed and it is not clear that it was ever filed. Therefore, while the tax return stated that Jinfu USA was wholly owned by CEO B, it was reasonable for Commerce to conclude that the 2003 document was not alone sufficient to establish ownership on November 2, 2002.

---

[16](...continued)
as part of the consideration for the transfer. *See* Pl.'s Br. at 13.

Based on the foregoing, the court finds that there is no evidence that Jinfu USA was the name of a corporate entity on November 2, 2002. Likewise, nothing indicates that any ownership interest in either Yousheng USA or Jinfu USA was transferred to CEO B on or before November 2, 2002. While CEO B may have made some effort to obtain ownership of Yousheng USA and then change its name to Jinfu USA, the record does not reflect that he was successful in doing so by November 2, 2002. Thus, the court cannot find as unsupported by substantial evidence Commerce's determination that CEO B did not have sole ownership of either Yousheng USA or Jinfu USA as of the claimed new shipper sale.

C.    Evidence of Affiliation: Control

A conclusion with respect to ownership does not end the court's inquiry as a finding of affiliation does not rest on ownership. In this regard, plaintiff further asserts that the Department unreasonably concluded that CEO B was not in a position to exercise control over either Yousheng USA or Jinfu USA within the meaning of 19 U.S.C. §§ 1677(33)(F) or (G) on November 2, 2002. *See* Pl.'s Br. at 27. According to plaintiff, Commerce disregarded the changes to affiliation law imposed by the Uruguay Round Agreements Act of 1994[17] with respect to the

---

[17]    The Uruguay Round Agreements Act of 1994 modified the then existing law to include, among other things, subsection (G),
                                                      (continued...)

importance of control to the agency's analysis, as well as this Court's interpretation of those changes.  *See id*. at 28.


Plaintiff first disputes the Department's finding that the record was devoid of evidence demonstrating CEO B's potential to influence Jinfu USA's sales or pricing decisions.  *See* Issues & Decision Mem. at 26.  In particular, plaintiff directs the court's attention to the interview with Mr. A, who became Yousheng USA's resident officer.  For plaintiff,

> [Commerce's] U.S. Sales Verification Report of May 5,
> 2004, . . . summarized [the] interview of [Mr. A],
> which unequivocally confirmed that [CEO B] controlled
> Jinfu-USA.  The [Department's] conclusion also is
> contradicted by the communications between [Mr. A] and
> [CEO B], which confirm that [CEO B] approved [Mr. A's]
> sales price to Jinfu-USA's customer.  Finally, [the
> Department's] conclusion ignores all of the evidence
> presented by the parties regarding the transfer of
> ownership of Jinfu-USA to [CEO B].  Thus, even if the
> parties did not complete the legal niceties of
> transferring ownership prior to the actual sales
> transactions in issue, there can be no serious dispute
> that [CEO B] attempted to acquire 100% ownership of
> Jinfu-USA and that [CEO B] and [Mr. A's] business
> relationship was based on their mutual understanding
> that [CEO B] owned Jinfu-USA. . . .

Pl.'s Br. at 29.

---

[17](...continued)
which added the notion of control to the statute.  *See* H.R. Doc.
No. 103-465 at 838, *reprinted in* 1994 U.S.C.C.A.N. (108 Stat.)
4041, 4174.  As the Statement of Administrative Action states,
"[t]he Administration believe[d] that including control in the
definition of 'affiliated' [would] permit a more sophisticated
analysis which better reflects the realities of the marketplace."
*Id*.

Thus, plaintiff challenges the Department's finding that Jinfu PRC and Yousheng USA or its successor Jinfu USA "had an ongoing, arm's-length commercial relationship established for the mutual benefit of each party."  Issues & Decision Mem. at 27; *see also* Pl.'s Br. at 29-30.  According to plaintiff, "the communications between the parties verified by the [Department] clearly establish that [Mr. A] advised [CEO B] of all material aspects of his resale, including the name of the U.S. customer, and that the resale by Jinfu-USA was not finalized until the resale price had been approved by [CEO B]."  Pl.'s Br. at 30.  Thus, plaintiff argues that it did not deal with Yousheng USA or its successor Jinfu USA at arm's length, but rather enjoyed substantial control over the company's business decisions, particularly those dealing with pricing.

As previously noted, a finding of control requires proof that one person is legally or operationally in a position to exercise restraint or direction over the other person, and that "the relationship with the third party must have the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise."  *TIJID, Inc. v. United States*, 29 CIT __, __, 366 F. Supp. 2d 1286, 1293 (2005); *see also* 19 U.S.C. § 1677(33).

Here, the court finds that the record contains definite and uncontroverted evidence that CEO B not only had the potential to influence what was then Yousheng USA's pricing decisions, but, in fact, exercised that control; and further that Mr. A believed his resale prices were subject to CEO B's approval.  Indeed, the record leaves little doubt that CEO B, while he may not have owned the U.S. entity,[18] certainly controlled that company's pricing decisions.  In addition, Commerce fails to cite substantial evidence that would support the opposite conclusion. Therefore, the court finds that Commerce unreasonably concluded that the two entities were not affiliated.

Support for this finding is found primarily in the Department's verification report.  For instance, in the report, Mr. A explains that for transactions where he resells honey originally purchased from Jinfu PRC, he takes the following steps:

> (1) negotiate material terms of sale with U.S. customer; (2) enter a non-binding sales contract with the U.S. customer; (3) purchase merchandise from Jinfu in the PRC; (4) inform [CEO B] by telephone of finalized . . . material terms of sale and fax him a copy of the sales contract; (5) receive bill of lading, which includes on-board date of the merchandise; (6)

---

[18]    With respect to the question of affiliation, it is simply immaterial that as of November 2, 2002, Yousheng USA had not yet been renamed Jinfu USA.  Whatever the name at a particular time, Yousheng USA and Jinfu USA were the same corporation.

receive shipping notification of estimated arrival date; (7) prepare sales invoices for estimated arrival date; and (8) issue invoice to the U.S. customer once the merchandise has cleared FDA.

Pl.'s App. 13 at 7.  For the sale in question, Mr. A stated that:

Subsequent to his negotiations with [Customer C], . . . [Mr. A] faxed a letter to [CEO B] relaying the result of his negotiations . . . and U.S. honey market research. . . .  In a reply fax, [CEO B] agreed that the sale with [Customer C] was a good opportunity for Jinfu USA and that the negotiated price was reasonable. As such, . . . [Mr. A] entered into a sales contract with [Customer C] . . . .

*Id.* at 6-7.


As a result, the fax sent by Mr. A to CEO B on November 13,

2002, read as follows:

Firstly, I would like to report you that the current market price of honey in the United States is between [[      ]] and [[      ]] per pound.  Because of the sharp reduction of the export of honey from other countries, the domestic sales and price of honey in the United States is very promising.

I contacted a US local client who was willing to order a container of honey at the ex-warehouse price of [[      ]] USD per ton on the condition that it can pass the examination of US customs and FDA.  Since the annual purchasing amount of this client is relatively significant, if a good relationship can be established with this client, it will be of great help to our company's sales to the US.

Please let me know you[r] opinion and advise me further.

Pl.'s App. 7.  CEO B sent a reply fax on the same day stating

that:

We received you[r] letter and felt happy that there are clients are [sic] interested in the honey product of

our company.  You did a good job on the report of the
US market.  We finished a container . . . on November
5.

In order to open the US market and better understand
the marketing information, I agree with you.  We accept
the client's quotation of [[      ]] USD per ton[19] as
ex-warehouse price on the condition that it passes the
examination of the US customs and FDA.  Please make the
preparation and keep in touch with the client for
purpose of long term cooperation.  I hereby authorize
you to sign contract with the client.

*Id.*


This evidence demonstrates that CEO B exercised control over

Yousheng USA's resale price of the honey to Customer C.  In his

reply to Mr. A, CEO B stated that "[w]e accept the client's

quotation of [[      ]] USD per ton . . . ."  *Id.*  That is,

based on the quoted price, he authorized Mr. A to enter into the

transaction.  *See id.*  In addition, when speaking of the benefits

of the Customer C deal, Mr. A stated that "it will be of great

help to our company's sales to the US."  *Id.*  The reference to

"our" company can only be understood as a broad reference to

"Jinfu Trading," which would encompass both Jinfu PRC and

Yousheng USA.  Thus, the faxes indicate that Mr. A did not enter

into the transaction at the quoted price before getting the

approval of CEO B, and that he believed he was working for a

---

[19]     The sale price between Jinfu PRC and Yousheng USA was
[[      ]] USD per ton.  *See* Jinfu PRC's Response to First
Supplemental Section A & C Questionnaire at 7.

single enterprise encompassing Jinfu PRC and Yousheng USA.

The record also demonstrates that Mr. A believed that his resale prices were subject to CEO B's control and indeed acted in accordance with that belief.  In addition to the faxes, the Department's discussion with Mr. A reveals that, after negotiating a deal with a U.S. customer, Mr. A would enter a non-binding contract with that customer, and then notify CEO B of the pending transaction.[20]  *See id.*  Once the agreed-upon price was approved by CEO B, Mr. A would finalize the U.S. transaction.  This clearly shows that Mr. A believed he was subject to CEO B's control.  Further, the record contains several references by Mr. A to Jinfu PRC as his company's "affiliate."  *See*, *e.g.*, *id.* at 3 ("[Mr. A] stated that Jinfu USA's parent company, and only affiliate, is Jinfu in the PRC."); *see also id*. at 9 ("[Mr. A] stated that Jinfu USA only purchases honey from its affiliate, Jinfu in the PRC.").  Thus, it is apparent that Mr. A understood that his pricing decisions were subject to CEO B's approval on November 2, 2002.  At no point does the Department demonstrate that it considered the relevance of this evidence with respect to

---

[20]     In the verification report, the Department noted that "[a]ccording to [Mr. A], within his culture sales contracts are not considered to be binding, and therefore, can be broken at any time."  Pl.'s Conf. App. 13 at 7 n.1.  This does not, however, alter the fact that Mr. A would not finalize a transaction with a U.S. customer unless and until he had received CEO B's approval.

the potential for CEO B to control Yousheng USA's resale price and his actual control of the price in the November 2, 2002 transaction. Rather, Commerce rests its finding on evidence relating to the ownership of the company. *See*, *e.g.*, Issues & Decision Mem. at 21 ("For purposes of these final results, we continue to find that Jinfu PRC and Jinfu USA were not affiliated based on our analysis of record evidence demonstrating that Jinfu PRC did not own Jinfu USA at the time of the relevant U.S. sale."). Therefore, the court finds that Commerce has not supported with substantial evidence its conclusion that Mr. A acted independently from CEO B's control, and that, in fact, the cited record evidence demonstrates the opposite conclusion. *See* 19 C.F.R. § 351.102(b); *see also Ta Chen Stainless Steel Pipe*, 23 CIT at 809, 811 (finding control where, among other things, the controlled company had been established by officers and managers of the controlling company, and where the controlled company only distributed the controlling company's products).

## CONCLUSION

Therefore, in accordance with the foregoing, the court finds that Commerce's conclusions with respect to affiliation in the Final Results are not supported by substantial evidence and, thus, remands this case. On remand, Commerce is directed to either find that Jinfu PRC and Yousheng USA were affiliated as of

November 2, 2002, and to reinstate plaintiff's new shipper review, or to provide other record evidence to support its conclusion that the companies were not affiliated.  In the event that the Department does not concur with the court's finding, it shall reopen the record to provide plaintiff with an opportunity to place thereon further evidence with respect to affiliation and to provide an explanation of that evidence.  Remand results are due December 6, 2006.  Comments are due January 5, 2007.  Replies to such comments are due January 16, 2007.

                                          /s/Richard K. Eaton
                                         Richard K. Eaton

Dated:     September 7, 2006
           New York, New York